### UNITED STATES of America, Plaintiff-Appellee,

v.

### Jarrett Vander SMITH, Jr., and Daniel Jay Schacht, Defendants-Appellants.

#### No. 26398.

United States Court of Appeals
Fifth Circuit.
May 14, 1969.

Will Gray, Houston, Tex., for defendants-appellants.

Morton L. Susman, U. S. Atty., James R. Gough, Joel P. Ray, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG and MORGAN, Circuit Judges, and LIEB, District Judge.

LIEB, District Judge:

On December 4, 1967, approximately twenty people gathered outside the Armed Forces Induction Center at Houston, Texas. Their purpose—not unexpectedly —was to protest American participation in the Vietnam conflict. They remained on the scene from about 6:30 A.M. to about 8:30 A.M. As such events will, this one attracted the news media and federal and local law enforcement agents.

Among the demonstrators[1] were Daniel Jay Schacht and Jarrett Vander Smith, Jr., the appellants in this case. Schacht was observed wearing "the fur felt Army officer's cap with the strap loose and hanging down, and with an Army officer's insignia upside down. On his body * * * he had an Army green shade 44 enlisted blouse with a U.S. Army Europe patch on the left shoulder." The buttons on the blouse, as well as the blouse itself, were the currently authorized buttons and blouse issued to service personnel. The eagle insignia on the cap was also of current issue. Smith was seen wearing an Army jacket or blouse with official current military buttons attached to it.

---

[1]. As we shall see, the word "demonstrator" has become a term of legal art, but for want of an adequate substitute it will be used in its generally accepted context, unless otherwise indicated.

Smith and Schacht were indicted, tried by a jury and convicted of violating 18 U.S.C.A. § 702 (1964)[2], which prohibits the unauthorized wearing of a distinctive part of an Army uniform. They made no attack on the jury finding that they did wear distinctive parts of the military uniform; they raised constitutional issues concerning the free speech guaranty of the First Amendment and the due process guaranty of the Fifth Amendment of the United States Constitution.

By way of defending the case in the District Court, Smith and Schacht contended that they qualified to wear parts of the uniform pursuant to 10 U.S.C.A. § 772(f) (1952)[3], which permits an actor to wear a military uniform in a theatrical production "if the portrayal does not tend to discredit that armed force." It is argued on appeal that the appellants were participating in a play or skit which was designed to expose the evil of the American presence in Vietnam. They maintain that their actions were protected by 10 U.S.C.A. § 772(f) (1952) or, if not, that the statute creating an exception to the principal violation acts as an unconstitutional restraint on the right of free speech and is unconstitutionally vague.

The evidence indicates that the demonstration in Houston was part of a nationally coordinated movement which was to take place contemporaneously at several places throughout the country. The appellants and their colleagues prepared a script to be followed at the induction center and they actually rehearsed their roles at least once prior to the appointed day before a student organization called the "Humanists."[4]

Initially it should be stated that the evidence does not situate Smith as a participant in the so-called "skit." Apparently his only function was to distribute leaflets to the onlookers. That portion of this opinion which considers the Section 772(f) defense, therefore, is limited to appellant Schacht; as to Smith the defense is inapposite.

The skit was composed of three people. There was Schacht who was dressed in a uniform and cap. A second person was wearing "military colored" coveralls. The third person was outfitted in typical Viet Cong apparel.[5] The first two men carried water pistols. One of them would yell, "Be an able American," and then they would shoot the Viet Cong with their pistols. The pistols expelled a red liquid which, when it struck the victim, created the impression that he was bleeding. Once the victim fell down the other two would walk up to him and exclaim, "My God, this is a pregnant woman." Without noticeable variation this skit was reenacted several times during the morning of the demonstration. A demonstrator testified at trial that the purpose of their activities was not "to discredit the Army exactly, to discredit the actions of the United States being involved." Undoubtedly that statement fairly depicts the objectives of Smith and Schacht.

Smith and Schacht were not convicted for disturbing the peace or for disorderly conduct. They were not charged with

2. 18 U.S.C.A. § 702 (1964):
Whoever, in any place within the jurisdiction of the United States or in the Canal Zone, without authority, wears the uniform or a distinctive part thereof or anything similar to the distinctive part of the uniform of any of the armed forces of the United States, Public Health Service or any auxiliary of such, shall be fined not more than $250 or imprisoned not more than six months, or both.

3. 10 U.S.C.A. § 772(f) (1952):
While portraying a member of the Army, Navy, Air Force, or Marine Corps, an actor in a theatrical or motion-picture production may wear the uniform of that armed force if the portrayal does not tend to discredit that armed force.

4. The record does not indicate whether this skit was enacted elsewhere by opponents of the Vietnam War at the other locations in the country where demonstrations were conducted on that day.

5. The identity of the person who wore the military coveralls was not determined by the authorities. Another university student was dressed as the Viet Cong.

sedition, treason, mutiny, or the like; nor were they prosecuted for the substance of their utterances, either oral or written. Smith and Schacht were not prosecuted because of their roles in the performance of a skit which was critical of the American involvement in Vietnam.

Smith and Schacht were prosecuted for their unauthorized wearing of a distinctive part of the military uniform, plain and simple. Without more, their convictions would be unassailable from a constitutional viewpoint. They wore portions of the current issue of the military uniform; they did not have lawful permission to wear the uniform; and they acted with knowledge of what they were doing. For their violation of the statute they were tried and convicted by a jury.

The appellants, however, seek to cloak their action with the First Amendment guaranty against intrusions on their right of free and unhampered speech. How has the United States violated their right to free speech? Smith and Schacht argue that by regulating the wearing of armed forces uniforms, the United States has, on this occasion restricted their constitutional right to peaceably demonstrate and speak on topics which are unpleasant to the majority of citizens; that the statutory regulation acts as a previous restraint on their peaceful activities.

### I.

The statute with which we are concerned, 18 U.S.C.A. § 702 (1964), proscribes certain *conduct*. It makes unlawful the wearing of a distinctive part of a military uniform without permission.

It is assumed, and we think properly, that the appellants had a perfect right to demonstrate when and where they did. The demonstration was peaceable and orderly; it was not illegal as such. Accord, Brown v. State of Louisiana, 383

U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). The appellants sought to highlight alleged governmental evils and they were free to do so as an incident to their rights as citizens. In Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966), the Court declared that:

> Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.

See also, Mills v. State of Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); Cantwell v. State of Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Constitutional principles caution us to be circumspect when deciding controversies that include problems affecting freedom of speech. In weighing the possible evils to be derived at the hands of a strong federal government, our forefathers decided that the infringement of a man's speech was primary.[6] And so, it has long been the policy of the courts to observe the rule enunciated recently in Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966):

> When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.[2] [Footnote Omitted]

■ What we have said, however, should not be understood to mean that we are powerless to act when First Amendment defenses are hoisted. Constitutional rights are not the special possession of man isolated from society; the rights extend to all men, and their welfare also must be considered. Freedom of speech is not illimitable.

6. Richards, The Historical Rationale of the Speech-and-Press Clause of the

First Amendment, 21 U.Fla.L.Rev. 203 (1968).

■ First Amendment rights "are not confined to verbal expression"; they include appropriate types of action. Brown v. State of Louisiana, *supra*, at 141–142, 86 S.Ct. at 724; Garner v. State of Louisiana, 368 U.S. 157, 82 S. Ct. 248, 7 L.Ed.2d 207 (1961). At the same time, "certain forms of conduct mixed with speech may be regulated or prohibited." Cox v. State of Louisiana, 379 U.S. 536, 563, 85 S.Ct. 476, 480, 13 L. Ed.2d 487 (1965). It becomes essential, therefore, for this Court to strike a constitutionally acceptable balance so that any statutory inhibition on the exercise of free speech will not fall within that vast wasteland of proscribed governmental activity.

The problem before us is not a novel one. The Supreme Court of the United States has contended with it on several occasions and, yet, it remains unresolved. We start with what the Court said in Cox v. State of Louisiana, *supra*, at 555, 85 S.Ct. at 464:

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech.

Smith and Schacht were participating in two modes of conduct at the same time that they were voicing their disapproval of their sovereign's involvement in Vietnam. First, Smith was distributing leaflets and Schacht was acting out his role as a soldier in the skit. As to these activities the Government has no quarrel. Second, both men were wearing distinctive parts of the current issue of the military uniform. This conduct was forbidden by Congress and their doing of it resulted in their prosecution for violation of a criminal statute.

■ Can the United States Government lawfully enforce a criminal statute which may have as an incidental effect the inhibition of an individual's right of free expression? We think that it can under proper circumstances.

The most instructive case available is Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). The State of Missouri had a statute which made it a felony for any person to enter into an agreement in restraint of trade or competition. Giboney and other members and officers of a local union attempted to induce Empire to refrain from selling its ice to certain retail ice peddlers who refused to join the local union. When Empire refused to join the boycott of the peddlers, the union commenced peaceful picketing of Empire's premises. In upholding the trial court, which had issued an injunction against the union to cease its picketing, the State Supreme Court found that the union was striving to compel Empire to enter with it into an agreement which would amount to a violation of a state criminal statute.

The labor union argued in the United States Supreme Court that it had a constitutional right under the First Amendment to picket Empire's premises in conjunction with the labor dispute. The Court, Mr. Justice Black writing, replied:

> Aside from the element of disseminating information through peaceful picketers, * * * it is difficult to perceive how it could be thought that these constitutional guaranties afford labor union members a peculiar immunity from laws against trade restraint combinations, unless, as appellants contend, labor unions are given special constitutional protection denied all other people.[2]

> * * * * * *

> *It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now.* Nothing that was said or decided in any of the cases relied on

by appellants calls for a different holding.

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. [Emphasis Added; Footnote Omitted]

336 U.S. 496–502, 69 S.Ct. 687–691. The Court unanimously upheld the injunction against the union.

Most recently the Supreme Court has had occasion to address itself to a controversy which appears strikingly similar to our own. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (February 24, 1969), the petitioners were suspended from school for knowingly violating a regulation which forbade wearing an armband at school as a form of protesting American involvement in Vietnam. The petitioners filed their complaint in the District Court seeking an injunction and nominal damages against the school officials. The lower court dismissed the complaint and the Court of Appeals for the Eighth Circuit affirmed by an equally divided court, 383 F.2d 988.

The Supreme Court reversed the dismissal of the complaint for the reason that the officials' action constituted a violation of petitioners' freedom of speech.

\* \* \* The wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment. \* \* \* It was closely akin to "pure speech" which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment. 393 U.S. 505–506, 89 S.Ct. at 736.

A serious examination of Tinker, however, reveals that it does not dictate the outcome of the instant case. The touchstone in both cases is the nature of the restriction that was thwarted by the demonstrators. In Tinker the petitioners ignored a hastily-conceived regulation which had been promulgated by the school principals shortly before and in anticipation of the demonstration.

Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities. 393 U.S. 507, 89 S.Ct. 737.

The distinction should now be evident. We are asked to consider the exercise of First Amendment rights against the background of a federal criminal statute.

■ We do not think that the statute prohibiting unlawful wearing of a military uniform must fall when it affects incidentally the exercise of free speech. We agree with the Court in Giboney when it stated that the Constitution does not extend "its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." [7]

■ We cannot say that the unauthorized wearing of a military uniform is on the same plane as the wearing of an armband. It does not constitute a "symbolic act" akin to "pure speech." The statute we are reviewing was narrowly drawn to prohibit certain conduct that infringes a substantial national interest in maintaining the dignity of the

---

7. Not even Smith and Schacht question the validity of the statute, except as it has been applied to them. We have been unable to find any cases which discuss the validity and legislative purpose of the statute, but there do exist cases which examine related statutes. With respect to Section 32 of the Criminal Code of March 6, 1909 (false impersonation of an officer of the United States), the Court in United States v. Barnow, 239 U.S. 74, 80, 36 S.Ct. 19, 22, 60 L.Ed. 155 (1915), said, "It is the aim of the section \* \* \* to maintain the general good repute and dignity of the service itself." See also, United States v. Lepowitch, 318 U.S. 702, 63 S.Ct. 914, 87 L.Ed. 1091 (1943); United States v. Wight, 176 F.2d 376 (2d Cir. 1949).

armed forces. Accord, Cox v. State of Louisiana, *supra*, at 564, 85 S.Ct. 453; contra, Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). Nor can it wisely be argued that the statute is vague. It forbids one type of conduct. Its language is plain and notice of its proscription is evident. Adderley v. State of Florida, 385 U.S. 39, 42, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

As the Supreme Court stated thirty years ago, in Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939):

> Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

See also, Cameron v. Johnson, 390 U.S. 611, 617, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

## II.

■ Smith and Schacht next argue that 10 U.S.C.A. § 772(f) (1952),[8] an exception to the criminal statute discussed above, is unconstitutionally vague. They quarrel with the section which permits an actor in a "theatrical or motion picture production" to wear a military uniform unless his actions "tend to discredit that armed force." We do not consider such objection well-founded. The language of legislative grace is amply clear. Coupled with appropriate common-sense instructions by the judge, a jury would certainly be capable of reaching a rational decision concerning the appellants' activities.

## III.

Following Appellant Smith's conviction and judgment of guilt the trial judge placed him on three years' probation with certain special conditions attached. In exchange for the privilege of probation Smith was required to "forego any association whatever with the Students for Democratic Society Organization," and to "Discontinue your association with the members of the Humanists group with which you violated the law." Smith argues that these strictures violate his First Amendment rights of expression and assembly.

■■ 18 U.S.C.A. § 3651 (1964) authorizes the trial court to place a criminal defendant on probation "for such period and upon such terms and conditions as the court deems best." Congress obviously intended by means of the broad statutory language to invest the court with great discretion to establish conditions which would lead to the defendant's ultimate acceptance by society. Barnhill v. United States, 279 F.2d 105 (5th Cir. 1960), cert. denied, 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960). Smith could have rejected probation and elected prison. He chose to enjoy the benefits of probation; he must also endure its restrictions. The trial court did not abuse its discretion in attaching the special conditions to Smith's probation.

Affirmed.

GOLDBERG, Circuit Judge (concurring specially):

Though concurring in the result my brothers have reached, I am impelled to uphold this conviction through a slightly different constitutional approach. I am less impressed by the distinction between speech and conduct than I am by the fact that the statute before us has a legitimate nonspeech objective.

I begin by noting that the statute under which the present conviction was obtained operates to preserve the integrity of the military uniform by restricting its use to authorized persons. Whatever the object of such a restriction, whether to protect against the possibility of military impersonation, or simply to safeguard the need for a sure and expedient means of military iden-

tification, the restriction nonetheless has only the most remote and incidental effect upon free speech.

In order better to illustrate the remoteness of this impact on First Amendment rights, the present case is usefully compared to O'Brien v. United States, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. In *O'Brien* the Supreme Court held that a prohibition against the knowing mutilation or destruction of a draft card was not unconstitutional as applied to one who burned his draft card in protest against the war in Vietnam. The Court based its decision in large measure on the fact that the government had a substantial nonspeech related interest in seeing that draft cards were not destroyed.[1]

The government interest in seeing that uniforms are not worn by unauthorized persons is also nonspeech oriented. It is no more affected by the use of the uniform as a vehicle of protest than was the governmental interest in draft cards. In fact, it is reasonable to say that the statute before us has an even less inhibiting effect on free speech than the statute in *O'Brien*. At least the statute before us enjoins only the *wearing* of a military uniform, not its destruction. As such its violation is complete when the uniform is donned. The subsequent use of the uniform for protest purposes is entirely irrelevant to the statute's real objectives. These objectives require that the patriot no less than the revolutionary, the bystander no

[1]. "This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Watever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest." 391 U.S., at 376–377, 88 S.Ct. at 1678, 1679, 20 L.Ed.2d at 679–680.

\*     \*     \*     \*     \*

"\* \* \* the governmental interest and the operation of the 1965 Amendment are limited to the noncommunicative aspect of O'Brien's conduct. The governmental interest and the scope of the 1965 Amendment are limited to preventing a harm to the smooth and efficient functioning of the Selective Service System. When O'Brien deliberately rendered unavailable his registration certificate, he wilfully frustrated this governmental interest. For this noncommunicative im-

pact of his conduct, and for nothing else, he was convicted.

"The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful. In Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 [73 A.L.R. 1484] (1931), for example, this Court struck down a statutory phrase which punished people who expressed their 'opposition to organized government' by displaying 'any flag, badge, banner, or device.' Since the statute there was aimed at suppressing communication it could not be sustained as a regulation of noncommunicative conduct. See also, NLRB v. Fruit & Vegetable Packers Union, 377 U.S. 58, 79, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (concurring opinion).

"In conclusion, we find that because of the Government's substantial interest in assuring the continuing availability of issued Selective Service certificates, because amended § 462(b) is an appropriately narrow means of protecting this interest and condemns only the independent noncommunicative impact of conduct within its reach, and because the noncommunicative impact of O'Brien's act of burning his registration certificate frustrated the Government's interest, a sufficient governmental interest has been shown to justify O'Brien's conviction." 391 U.S. at 381, 382, 88 S.Ct. at 1681, 1682, 20 L.Ed.2d at 683.

**638**

less than the protester, forego the un-authorized wearing of the uniform. First Amendment rights do not suffer by the enforcement of such a statute.

Nothing in Tinker v. Des Moines Independent Community School District, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 2d 731, affects the constitutionality of the statute before us. In *Tinker* a school regulation banning the wearing of arm-bands to school was declared unconstitutional as an unreasonable restriction on free speech. While it seems plausible to say that the armband was no more or less a symbol of protest to its wearers than was the uniform in the case before us, the armbands, unlike the uniform and the draft cards, were not appendant to any valid governmental interest.

There was, to be sure, a valid governmental interest in *Tinker* that required the preservation of order and discipline within the school, and this the Court acknowledged. But this interest was no more derivative from or inherent in armbands than in purely verbal criticism of the Vietnam war. In short, armbands are "akin to pure speech," 393 U.S. at 505, 89 S.Ct. 733, because they generate no governmental interest apart from the message they communicate.

Uniforms and draft cards, on the other hand, are essential to purposes and perform secondary functions which have nothing to do with free speech. Since regulation of their use is not designed to also regulate attitudes toward them, *cf.* Stromberg v. People of State of California, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, their enforcement will not imperil First Amendment freedoms. I am convinced that the statute before us was not conceived in the suppression of freedom of expression. I must therefore conclude that its nullification cannot be justified because its violation was birthed in protest.

I would also affirm the judgment of the district court.