## ASHTON *v.* KENTUCKY.

No. 619.   Argued April 28, 1966.—
Decided May 16, 1966.

*Ephraim London* argued the cause for petitioner. With him on the brief were *Dan Jack Combs* and *Melvin L. Wulf.*

*John B. Browning,* Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the brief was *Robert Matthews,* Attorney General.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner was sentenced to six months in prison and fined $3,000 for printing a pamphlet found to be prohibited by the common law of criminal libel in Kentucky. The Kentucky Court of Appeals, with three judges dissenting, affirmed petitioner's conviction. 405 S. W. 2d 562. We granted certiorari (382 U. S. 971) and reverse.

Petitioner went to Hazard, Kentucky, in 1963, where a bitter labor dispute raged, to appeal for food, clothing and aid for unemployed miners. The challenged pamphlet, which had a limited circulation, stated concerning Sam L. Luttrell, Chief of Police of Hazard:

"Six weeks ago I witnessed a plot to kill the one pro-strike city policeman on the Hazard Force. Three of the other cops were after him while he was on night-duty. It took 5 pickets guarding him all night long to keep him from getting killed, but they could not prevent him from being fired, which he was three weeks ago. Another note on the City Police: The Chief of the force, Bud Luttrell, has a job on the side of guarding an operator's home for $100 a week. Its against the law for a peace officer to take private jobs."

It said concerning Charles E. Combs, the Sheriff:

"The High Sheriff has hired 72 deputies at one time, more than ever before in history; most of them hired because they wanted to carry guns. He, Sheriff Combs, is also a mine operator—in a recent Court decision he was fined $5,000 for intentionally blinding a boy with tear-gas and beating him while he was locked in a jail cell with his hands cuffed. The

boy lost the sight of one eye completely and is nearly blind in the other. Before the trial Sheriff Combs offered the boy $75,000 to keep it out of court, but he refused. Then for a few thousand dollars Combs probably bought off the jury. The case is being appealed by the boy to a higher court—he wants $200,000. Combs is now indicted for the murder of a man—voluntary manslaughter. Yet he is still the law in this county and has the support of the rich man because he will fight the pickets and the strike. The same is true of the State Police. They escort the scabs into the mines and hold the pickets at gunpoint."

And it said respecting Mrs. W. P. Nolan, co-owner of the Hazard Herald:

"The town newspaper, the *Hazard Herald,* has hollered that 'the commies have come to the mountains of Kentucky' and are leading the strike. The *Herald* was the recipient of over $14,000 cash and several truckloads of food and clothing which were sent as the result of a CBS–TV show just before Christmas. The story was on the strike and aid was supposed to be sent to the pickets in care of the *Hazard Herald,* however the editor, Mrs. W. P. Nolan, is vehemently against labor—she has said that she would rather give the incoming aid to the merchants in town than to the miners. Apparently that is what she has done, for only $1100 of the money has come to the pickets, and none of the food and clothes. They are now either still under lock and key, or have been given out to the scabs and others still."

The indictment charged "the offense of criminal libel" committed "by publishing a false and malicious publication which tends to degrade or injure" the three named

persons. The trial court charged that "criminal libel is defined as any writing calculated to create disturbances of the peace, corrupt the public morals, or lead to any act, which, when done, is indictable."

The court also charged that malice is "an essential element of this offense" and falsity as well.

The Court of Appeals in affirming the judgment of conviction adopted a different definition of the offense of criminal libel from that given the jury by the trial court. It ruled that the element of breach of the peace was no longer a constitutional basis for imposing criminal liability. It held that the common-law crime of criminal libel in Kentucky is "the publication of a defamatory statement about another which is false, with malice."

We indicated in *Shuttlesworth* v. *Birmingham,* 382 U. S. 87, that where an accused is tried and convicted under a broad construction of an Act which would make it unconstitutional, the conviction cannot be sustained on appeal by a limiting construction which eliminates the unconstitutional features of the Act, as the trial took place under the unconstitutional construction of the Act. We think that principle applies here. Petitioner was tried and convicted according to the trial court's understanding of Kentucky law, which defined the offense as "any writing calculated to create disturbances of the peace . . . ."

We agree with the dissenters in the Court of Appeals who stated that: ". . . since the English common law of criminal libel is inconsistent with constitutional provisions, and since no Kentucky case has redefined the crime in understandable terms, and since the law must be made on a case to case basis, the elements of the crime are so indefinite and uncertain that it should not be enforced as a penal offense in Kentucky."

The case is close to *Cantwell* v. *Connecticut,* 310 U. S. 296, involving a conviction of the common-law crime

of inciting a breach of the peace. The accused was charged with having played in the hearing of Catholics in a public place a phonograph record attacking their religion and church. In reversing we said: "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. . . . Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application." *Id.*, at 308.

In *Terminiello* v. *Chicago,* 337 U. S. 1, we held unconstitutional an ordinance which as construed punished an utterance as a breach of the peace "if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance." *Id.*, at 3. We set aside the conviction, saying:

> "The vitality of civil and political institutions in our society depends on free discussion. As Chief Justice Hughes wrote in *De Jonge* v. *Oregon,* 299 U. S. 353, 365, it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.
>
> "Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It

may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Id.*, at 4.

Convictions for "breach of the peace" where the offense was imprecisely defined were similarly reversed in *Edwards* v. *South Carolina,* 372 U. S. 229, 236–238, and *Cox* v. *Louisiana,* 379 U. S. 536, 551–552. These decisions recognize that to make an offense of conduct which is "calculated to create disturbances of the peace" leaves wide open the standard of responsibility. It involves calculations as to the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments *per se.* This kind of criminal libel "makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence." Chafee, Free Speech in the United States 151 (1954).

Here, as in the cases discussed above, we deal with First Amendment rights. Vague laws in any area suffer a constitutional infirmity.[1] When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.[2] We

---

[1] *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *Collins* v. *Kentucky,* 234 U. S. 634; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; *Connally* v. *General Construction Co.,* 269 U. S. 385; *Cline* v. *Frink Dairy Co.,* 274 U. S. 445; *Smith* v. *Cahoon,* 283 U. S. 553; *Champlin Refining Co.* v. *Commission,* 286 U. S. 210; *Lanzetta* v. *New Jersey,* 306 U. S. 451; *Wright* v. *Georgia,* 373 U. S. 284; *Giaccio* v. *Pennsylvania,* 382 U. S. 399. Cf. *Scull* v. *Virginia,* 359 U. S. 344; *Raley* v. *Ohio,* 360 U. S. 423.

[2] *Stromberg* v. *California,* 283 U. S. 359; *Herndon* v. *Lowry,* 301 U. S. 242; *Thornhill* v. *Alabama,* 310 U. S. 88; *Winters* v. *New York,* 333 U. S. 507; *Smith* v. *California,* 361 U. S. 147; *Cramp* v. *Board of Public Instruction,* 368 U. S. 278; *NAACP* v. *Button,* 371 U. S. 415; *Baggett* v. *Bullitt,* 377 U. S. 360; *Dombrowski* v. *Pfister,* 380 U. S. 479.

said in *Cantwell* v. *Connecticut, supra,* that such a law must be "narrowly drawn to prevent the supposed evil," 310 U. S., at 307, and that a conviction for an utterance "based on a common law concept of the most general and undefined nature," *id.,* at 308, could not stand.

All the infirmities of the conviction of the common-law crime of breach of the peace as defined by Connecticut judges are present in this conviction of the common-law crime of criminal libel as defined by Kentucky judges.

*Reversed.*

MR. JUSTICE HARLAN concurs in the result.