[15 NE3d 805, 991 NYS2d 792]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAPHAEL GOLB, Appellant.

Argued March 25, 2014; decided May 13, 2014

**POINTS OF COUNSEL**

*Law Office of Ronald L. Kuby*, New York City (*Ronald L. Kuby* and *Leah M. Busby* of counsel), for appellant. I. The trial court's refusal to properly limit the definitions of "benefit,"

"harm," "injury" and "fraud" compelled the jury to criminalize expressions of defendant's opinion, of statements of fact, and causing hurt feelings to various scholars, all of which are protected by the First Amendment. These convictions render the statutes void for vagueness, without a limiting construction from this Court. (*McIntyre v Ohio Elections Comm'n*, 514 US 334; *People v Briggins*, 50 NY2d 302; *Carpenter v United States*, 484 US 19; *Kolender v Lawson*, 461 US 352; *Smith v Goguen*, 415 US 566; *Ashton v Kentucky*, 384 US 195; *Layshock ex rel. Layshock v Hermitage School Dist.*, 650 F3d 205; *People v Kase*, 76 AD2d 532; *Hustler Magazine, Inc. v Falwell*, 485 US 46.) II. The communications that are the subject of counts 3, 40, and 48 are protected by the First Amendment and cannot be criminalized; doing so would render Penal Law § 240.30 (1) unconstitutionally vague and overbroad. (*People v Smith*, 89 Misc 2d 789; *People v Dupont*, 107 AD2d 247; *Papish v Board of Curators of Univ. of Mo.*, 410 US 667; *People v Dietze*, 75 NY2d 47; *People v Bethea*, 1 Misc 3d 909[A], 2004 NY Slip Op 50007[U]; *People v Singh*, 187 Misc 2d 465; *People v Kochanowski*, 186 Misc 2d 441, 95 NY2d 965.) III. Defendant was convicted of a crime based exclusively upon his violating a terms of service agreement with New York University. Applying Penal Law § 156.05 to criminalize such violations renders the statute unconstitutionally vague. (*Chicago v Morales*, 527 US 41.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Vincent Rivellese* and *Alan Gadlin* of counsel), for respondent. I. The trial court properly instructed the jury on the elements of the charged crimes. Those instructions ensured that the convictions did not violate defendant's First Amendment right to free speech. (*People v Hills*, 95 NY2d 947; *People v Samuels*, 99 NY2d 20; *People v Ladd*, 89 NY2d 893; *People v Coleman*, 70 NY2d 817; *People v Dory*, 59 NY2d 121; *People v Dym*, 163 AD2d 150; *People v Radcliffe*, 232 NY 249; *People v Kase*, 76 AD2d 532, 53 NY2d 989; *People v Taylor*, 14 NY3d 727; *United States v Williams*, 553 US 285.) II. The aggravated harassment counts were constitutionally applied to defendant because the convictions did not criminalize defendant's beliefs or his speech; they criminalized his conduct. (*United States v Williams*, 553 US 285; *People v Shack*, 86 NY2d 529; *People v Nelson*, 69 NY2d 302; *United States v Petrillo*, 332 US 1; *Maynard v Cartwright*, 486 US 356; *Boyce Motor Lines, Inc. v United States*, 342 US 337; *Broadrick v Oklahoma*, 413 US 601; *Gooding v Wilson*, 405 US 518; *People v Smith*, 89 Misc 2d 789; *People v Johnson*, 208 AD2d 1051.) III. Defendant was properly convicted of unauthorized

use of a computer for using New York University's computers to commit crimes; Penal Law § 156.05 was not vague as applied to defendant. (*United States v Williams*, 553 US 285; *People v Shack*, 86 NY2d 529; *People v Nelson*, 69 NY2d 302; *Maynard v Cartwright*, 486 US 356; *Boyce Motor Lines, Inc. v United States*, 342 US 337; *Ratzlaf v United States*, 510 US 135.)

*Law Office of Marc Fernich*, New York City (*Marc Fernich* of counsel), for National Association of Criminal Defense Lawyers and another, amici curiae. The definitions of "fraud," "benefit" and "injury" should be limited to tangible, monetary or legal benefits and harms to avoid unconstitutional vagueness, vindicate the legislative purpose and implement existing case law. (*People v Swift*, 278 AD2d 110; *People v Calderon*, 143 Misc 2d 315; *Tracy v Freshwater*, 623 F3d 90; *People v Bentley*, 78 Misc 2d 578; *Russo v State of New York*, 672 F2d 1014; *People v Nawrocki*, 163 AD2d 887; *People v Chive*, 189 Misc 2d 653; *People v Turner*, 234 AD2d 704; *People v Hooks*, 71 AD3d 1184.)

## OPINION OF THE COURT

ABDUS-SALAAM, J.

University of Chicago Professor Norman Golb is a scholar of the Dead Sea Scrolls. This case involves an Internet campaign by Golb's son, Raphael Golb, to attack the integrity and harm the reputation of other Dead Sea Scrolls academics and scholars, while promoting the views of his father.

To accomplish his goal of discrediting and harming these individuals, defendant, using pseudonyms and impersonating real academics and scholars, sent emails to museum administrators, academics and reporters. He published anonymous blogs. He concocted an elaborate scheme in which he used a pseudonym to engage one professor in an email exchange, and then impersonated a different scholar to criticize that professor's emails. Defendant impersonated a New York University (NYU) professor and sent emails to NYU students and NYU deans indicating that the professor had plagiarized the work of Professor Golb.

A New York County grand jury charged defendant with 51 counts of identity theft, criminal impersonation, forgery, aggravated harassment and unauthorized use of a computer. He proceeded to a jury trial, where 31 counts were submitted for the jury's consideration. The jury convicted on 30 counts: two counts of identity theft in the second degree; 14 counts of criminal impersonation in the second degree; 10 counts of forgery in

the third degree; three counts of aggravated harassment in the second degree; and one count of unauthorized use of a computer. Defendant was sentenced to six months in jail and five years of probation on the identity theft counts and to concurrent lesser terms on the remaining counts. The Appellate Division modified the Supreme Court judgment to the extent of vacating the identity theft conviction in the first count of the indictment and dismissing that count, and otherwise affirming the judgment (102 AD3d 601 [1st Dept 2013]). A Judge of this Court granted defendant leave to appeal (20 NY3d 1099 [2013]). For the reasons that follow, we affirm the convictions for nine counts of criminal impersonation in the second degree and all of the convictions for forgery. We vacate the conviction for identity theft in the second degree; five of the convictions for criminal impersonation in the second degree; all of the convictions for aggravated harassment in the second degree, and the conviction for unauthorized use of a computer.

## I.

### The Dead Sea Scrolls and Defendant's Internet Campaign

As was explained at the trial, the Dead Sea Scrolls are a collection of ancient religious writings dating from the second and third century B.C.E. to the first century C.E.[1] They were discovered in 1948 in caves near Qumran, in the West Bank. Norman Golb, defendant's father, is a professor at the University of Chicago, and a scholar on the subject of the Scrolls. There is disagreement among scholars and experts about who wrote the Scrolls. One view, known as the Qumran-Sectarian theory, or Sectarian theory, is that the Scrolls were writings of a Jewish sect, living in or near Qumran.

Norman Golb and others disagree with the Qumran-Sectarian theory. They believe that the Scrolls were writings of various groups and that the writings were rescued from libraries in Jerusalem and brought to the caves for safekeeping at the time of the siege and sacking of the city by Roman troops in 70 C.E. (the Jerusalem libraries theory). Professor Golb challenges the Qumran-Sectarian theory as unsupported by any actual evidence. In his 1995 book, Who Wrote the Dead Sea Scrolls?, Professor Golb discusses not only the history of Scroll research,

---

1. B.C.E. (Before the Common Era) and C.E. (the Common Era) are the equivalent of B.C. and A.D., respectively.

but criticizes what he believes to be unethical research practices regarding the Scrolls.

Beginning in September 2006, the Dead Sea Scrolls became the subject of a series of museum exhibits. Defendant engaged in an Internet campaign to criticize those involved in the exhibits because, in defendant's opinion, the exhibits did not present his father's theories about the origin of the Scrolls. One of defendant's targets was Robert Cargill, who at the time was a graduate student at the University of California in Los Angeles (UCLA) working toward his Ph.D. in near eastern languages and culture. Cargill had published on the topic of the Scrolls. In 2007, the Scrolls were put on exhibit at the San Diego Natural History Museum. For use at that exhibit, Cargill created a digital movie called "Ancient Qumran," which was a silent tour of the site where the Scrolls were discovered, and he wrote a script to be read in conjunction with the movie. The script did not describe Professor Golb's view of the Scrolls' origins.

Using pseudonyms, defendant sent emails to UCLA media addresses including newsmedia.ucla.edu, a UCLA professor, Cargill's doctoral advisor, many other "ucla.edu" addresses, and an entertainment company with which Cargill had signed a contract, criticizing Cargill and questioning his scholarship. Cargill testified that everyone in his department, people in the press room, the Provost of UCLA, and his dean asked him "what the hell is going on, what is this all about?" On a number of occasions, defendant used an anonymous blog to post his grievances about the San Diego exhibit and the Cargill movie.

When the Dead Sea Scrolls exhibit moved to Raleigh, North Carolina, defendant targeted Stephen Goranson, a library clerk at Duke University who had published articles on the Scrolls. Goranson disagreed with Professor Golb's theories and criticized them in public Internet forums. In July 2008, writing as "Peter Kaufman, Ph.D.," defendant separately emailed the Provost and the President of Duke University, as well as Goranson's supervisor at the library, complaining about Goranson's purported Internet attacks on Professor Golb and suggesting that they consider whether this conduct was appropriate for a Duke employee. The Provost responded that a supervisor was speaking to Goranson and advising him of his obligations. Defendant also created an email account under the name of "steve.goransongmail.com."

Defendant also undertook an elaborate scheme involving the impersonation of Dead Sea Scrolls scholar and retired Harvard

Professor Frank Cross. The first layer of the scheme was to assume the pseudonym of "Jerome Cooper" to engage in an email exchange with University of North Carolina Professor Bart Ehrman (who had been slated to lecture at the Raleigh exhibit) about the origin of the Scrolls. Defendant then anonymously published a blog denouncing the selection of Ehrman as lecturer and publishing the emails from Professor Ehrman to "Jerome Cooper," which defendant said Cooper had been "good enough to forward to me." Defendant's next step was to create the email address "frank.cross2gmail.com" and send four separate but identical messages to four University of North Carolina scholars. In those emails from the "Frank Cross" email address, defendant attached links to his anonymous blog entries containing Ehrman's emails, and stated that "Bart" had "put his foot in his mouth again." He signed those emails "Best, Frank Cross."

The Scrolls were put on exhibit at the Jewish Museum in New York City in the fall of 2008, and NYU Professor Lawrence Schiffman was scheduled as a lecturer. Defendant used the pseudonym "Peter Kaufman" to publish an article about Schiffman on the social news website NowPublic entitled "Plagiarism and the Dead Sea Scrolls: Did NYU department chairman pilfer from Chicago historian's work?" Defendant as "Kaufman" wrote of a "little-known case of apparent academic quackery." He complained of Schiffman's failure to credit Professor Golb for ideas expressed in Schiffman's articles about the Scrolls, and Schiffman's repeated plagiarisms of Golb's work.

Using NYU computers, defendant sent emails from another account he created—"larry.schiffmangmail.com"—to four of Schiffman's students and multiple NYU addresses of Schiffman's colleagues that included a link to the article. The emails stated, among other things, that "someone is intent on exposing a minor failing of mine that dates back almost fifteen years ago" and that "[t]his is my career at stake." He signed those emails "Lawrence Schiffman." Additionally, defendant sent identical emails from the Schiffman email address to the Provost of NYU and the Dean of NYU Graduate School of Arts and Science. Defendant, as Schiffman, asked what action he could take "to counter charges of plagiarism that have been raised against me" and stated:

> "Apparently, someone is intent on exposing a failing
> of mine that dates back almost fifteen years ago. It

is true that I should have cited Dr. Golb's articles when using his arguments, and it is true that I misrepresented his ideas. But this is simply the politics of Dead Sea Scrolls studies. If I had given credit to this man I would have been banned from conferences around the world."

He signed those emails "Lawrence Schiffman, professor."

NYU's Senior Vice Provost responded to this email, stating that he had assigned the matter to a dean for further investigation. Defendant, as "Schiffman," forwarded that email from the Vice Provost (including defendant's email to the Provost) to five NYU school newspaper email addresses, asking that they not mention this matter and stating that his "career is at stake." He signed those emails "Lawrence Schiffman."

In the fall of 2008, the Scrolls exhibit was scheduled to move to the Royal Ontario Museum (ROM) in Toronto. Dr. Jonathan Seidel, a rabbi in Oregon and a professor of Judaic studies at the University of Oregon, had studied with Professor Schiffman at NYU. Defendant created the email address "seidel.jonathang-mail.com" and sent an email to the Board of Trustees at the ROM, blind copying numerous other individuals at the museum. That email, among other things, included links to articles concerning the San Diego exhibition of the Scrolls and criticism by Professor Golb of the exhibit, which was curated by Dr. Risa Levitt Kohn, the same individual who was curating the exhibit at the ROM. The email stated that "the San Diego exhibitors set out to confuse the public" and described a quoted statement from Dr. Kohn defending the exhibit which she had curated as "shockingly obscurantist . . . for someone involved in creating a museum exhibit at the ROM." He signed those emails "With best regards, Jonathan Seidel."

Using the Seidel email address, defendant also sent an email to Dr. Kohn. It contained a link to defendant's (anonymous) blog about Dr. Kohn and Michael Hager, the director of the San Diego museum where the Scrolls had been exhibited. The blog pointed out that Hager had been defending Dr. Kohn and the San Diego exhibit. It criticized Hager and Kohn, and pointed out that Professor Golb had subjected the San Diego exhibit to a "searing critique." The email sought Dr. Kohn's opinion on the two theories about the Scrolls and asked if she was planning to answer Professor Golb's critique. It was signed "With best wishes, Jonathan Seidel."

The same day that he sent the email to Dr. Kohn, defendant sent another email from "Seidel" to 79 Dead Sea Scrolls scholars, asking for help in preparing a response to misinformation which was being spread around the Internet. He included a link to his anonymous blog, and a link and a quotation from an article in the French newspaper Le Monde, which defendant (as Seidel) stated was "outrageous." The quote from Le Monde was that "[t]he connection between the Essenes, who were thought to have written the scrolls, and Qumran has been reduced to nothing, just as the major American historian and paleographer N. Golb had already written." The email stated that "[t]hese lies about the Chicago filth must be answered as quickly as possible, so please let me know if you're willing to help out . . . ." In contrast to his email to Dr. Kohn, which promoted the Golb theory, this email appears to be calling Professor Golb "Chicago filth." It was signed "Best, Jonathan S." Defendant also used the Seidel email address to contact approximately 85 individuals, many of whom had university email addresses, urging them to "condemn the continuing filth from Chicago, just as Dr. Stephen Goranson of Duke University has had the courage to do." That too was signed "Best, Jonathan S."

## II.

### Criminal Impersonation in the Second Degree

Defendant was convicted of 14 counts of criminal impersonation in the second degree. A person is guilty of this crime when he or she "[i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another" (Penal Law § 190.25 [1]). The criminal impersonation counts related to defendant's actions against Schiffman, Goranson, Seidel and Cross. Although requested to do so by defendant, the trial court did not limit the statutory terms "benefit" or "injure" in its charge to the jury. The Appellate Division held that "[t]he court was under no obligation to limit the definitions of 'injure' or 'defraud'—terms used in the forgery and criminal impersonation statutes—to tangible harms such as financial harm" (102 AD3d at 602, citing *People v Kase*, 76 AD2d 532, 537-538 [1st Dept 1980], *affd* 53 NY2d 989 [1981]). Defendant maintains that the trial court's failure to properly limit and define the terms "injure" and "benefit" constituted reversible error because the jury could have interpreted the

statute as capturing any benefit or harm. Thus, argues defendant, when literally *anything* can be a legally cognizable benefit or harm, one can be found guilty of violating this law if one, for example, simply causes hurt feelings, mocks or criticizes. Similarly, says defendant, a benefit could be any gain or advantage, no matter how slight.

Cases applying Penal Law § 190.25 have traditionally involved monetary fraud or interference with government operations (*see e.g. People v Sanchez*, 84 NY2d 440 [1994] [impersonation of an FBI agent]; *People v Hooks*, 71 AD3d 1184 [3d Dept 2010] [after damaging victim's vehicle, defendant called police station, identifying herself as victim, informing them that she did not want to press charges]; *People v Nawrocki*, 163 AD2d 887 [4th Dept 1990] [defendant used his brother's name, Social Security number and employment status to apply for and receive a loan from a finance company]; *People v Chive*, 189 Misc 2d 653 [2001] [conviction for falsely identifying oneself to police and possession of an altered passport]; *People v Bentley*, 78 Misc 2d 578 [1974] [woman signed a false name to a supermarket cash register receipt]; *People v Diamond*, 77 Misc 2d 412 [1974] [conviction for seeking to avoid an arrest by impersonating a transit authority conductor]). The Appellate Division cited *People v Kase* (76 AD2d 532 [1st Dept 1980], *affd* 53 NY2d 989 [1981]) in support of its holding that "injure" and "defraud" are not limited to tangible harms such as financial harms involved in the filing of a false instrument. There, Kase argued that Penal Law § 190.25 did not apply where the People had not demonstrated that there had been a pecuniary loss to the State, and the court disagreed, finding that it is sufficient if the fraud impacts the State's power to fulfill its governmental responsibilities (*id.* at 537).

■ Here, defendant did not cause any pecuniary loss or interfere with governmental operations. While we agree with defendant that the statutory terms "injure" and "benefit" cannot be construed to apply to *any* injury or benefit, no matter how slight, we conclude that injury to reputation is within the "injury" contemplated by Penal Law § 190.25. Many people, particularly with a career in academia, as relevant to this case, value their reputations at least as much as their property,[2] and

---

2. "Good name in man and woman, dear my lord,
   Is the immediate jewel of their souls.

we believe the legislature intended that the scope of the statute be broad enough to capture acts intended to cause injury to reputation.

Accordingly, a person may be found guilty of criminal impersonation in the second degree if he or she impersonates another with the intent to cause a tangible, pecuniary injury to another, or the intent to interfere with governmental operations (*see e.g. People v Hooks*, 71 AD3d 1184 [3d Dept 2010]; *People v Nawrocki*, 163 AD2d 887 [4th Dept 1990]). In addition, a person who impersonates someone with the intent to harm the reputation of another may be found guilty of this crime. Here, there was sufficient evidence to support the jury's finding that defendant's emails impersonating Schiffman, Seidel and Cross were more than a prank intended to cause temporary embarrassment or discomfiture, and that he acted with intent to do real harm.

█ █ While we affirm most of the criminal impersonation convictions, we hold that the mere creation of email accounts in the names of Schiffman, Seidel, Goranson and Cross (in contrast to the use of those accounts to send emails) does not constitute criminal conduct under Penal Law § 190.25. The mere creation of email accounts that are not used does no substantial harm to anyone. Additionally, the email sent from the Seidel email address to Dr. Kohn, asking her opinion on the differing theories about the Scrolls and whether she was planning to answer Professor Golb's critique, is insufficient to support a conviction for criminal impersonation in the second degree. Unlike the other emails, this email sent in another person's name does not prove the requisite intent to cause injury, either to reputation or otherwise. Thus, we vacate the convictions on those counts.

## III.

### Aggravated Harassment in the Second Degree

█ Penal Law § 240.30 (1) (a) provides that "[a] person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she . . . communicates with a person, anonymously or

---

Who steals my purse steals trash. 'Tis something, nothing:
'Twas mine, 'tis his, and has been slave to thousands.
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed." (Shakespeare, Othello, act III, scene 3.)

otherwise, by telephone, by telegraph, or by mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm." We agree with defendant that this statute is unconstitutionally vague and overbroad, and that his conviction of three counts of aggravated harassment related to his conduct toward Schiffman, Goranson and Cargill must be vacated.

In *People v Dietze* (75 NY2d 47 [1989]), this Court struck down a similar harassment statute, former Penal Law § 240.25, which prohibited the use of abusive or obscene language with the intent to harass, annoy or alarm another person. We determined that the statute was unconstitutional under both the State and Federal Constitutions, noting that "any proscription of pure speech must be sharply limited to words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence" (*id.* at 52).

The reasoning applied in *Dietze* applies equally to our analysis of Penal Law § 240.30 (1) (a). The statute criminalizes, in broad strokes, any communication that has the intent to annoy. Like the harassment statute at issue in *Dietze*, "no fair reading" of this statute's "unqualified terms supports or even suggests the constitutionally necessary limitations on its scope" (*id.* at 52; *see also People v Dupont*, 107 AD2d 247, 253 [1st Dept 1985] [observing that the statute's vagueness is apparent because "(i)t is not clear what is meant by communication 'in a manner likely to cause annoyance or alarm' to another person"]). And, as in *Dietze*, "we decline to incorporate such limitations into the statute by judicial construction" because that would be "tantamount to wholesale revision of the Legislature's enactment, rather than prudent judicial construction" (*id.* at 52, 53).

Three federal judges have already found this statute unconstitutional (*see Vives v City of New York*, 305 F Supp 2d 289, 299 [SD NY 2003, Scheindlin, J.], *revd on other grounds* 405 F3d 115 [2d Cir 2005] ["where speech is regulated or proscribed based on its content, the scope of the effected speech must be clearly defined"]; *see also Vives*, 405 F3d 115, 123-124 [2d Cir 2005, Cardamone, J., dissenting in part, concurring in part] [Penal Law § 240.30 (1) unconstitutional on its face and as applied]; *Schlagler v Phillips*, 985 F Supp 419, 421 [SD NY 1997, Brieant, J.], *revd on other grounds* 166 F3d 439 [2d Cir 1999] [statute is "utterly repugnant to the First Amendment of the United States Constitution and also unconstitutional for vagueness"]).

Accordingly, we conclude that Penal Law § 240.30 (1) is unconstitutional under both the State and Federal Constitutions, and we vacate defendant's convictions on these counts.

IV.

### The Convictions for Forgery in the Third Degree, Identity Theft in the Second Degree and Unauthorized Use of a Computer

■ "A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument" (Penal Law § 170.05). There was sufficient evidence to show that defendant deceived people by sending emails from accounts in the names of Schiffman, Seidel and Cross, and accordingly we affirm his convictions on those counts.

However, we vacate the convictions on the remaining counts of unauthorized use of a computer and identity theft in the second degree. Under Penal Law § 156.05, "[a] person is guilty of unauthorized use of a computer when he or she knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization." The term "without authorization" is defined as "to access a computer . . . without the permission of the owner . . . or after actual notice to such person that such use or access was without permission . . . ." (Penal Law § 156.00 [8].)

■ Defendant asserts that he had permission to access the NYU computers as an alumnus who joined the "Friends of Bobst Library Program." The People argue that using the computer to commit a crime cannot be an authorized use. However, the definitions and wording of the statute and the legislative history indicate that the statute is intended to reach a person who accesses a computer system without permission (i.e., a hacker) and the language does not appear to encompass defendant's conduct here. "[I]f two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the rule of lenity" (*People v Green*, 68 NY2d 151, 153 [1986] [internal quotation marks and citation omitted]). Thus, the People did not sustain their burden of proof that defendant was guilty of unauthorized use of the NYU computers, and we therefore vacate defendant's conviction under Penal Law § 156.05.

■ Lastly, as pertinent here, a person commits identity theft in the second degree "when he or she knowingly and with intent

to defraud assumes the identity of another person by presenting himself or herself as that other person, or by acting as that other person or by using personal identifying information of that other person, and thereby" "commits or attempts to commit a felony" (Penal Law § 190.79 [3]). The attempted felony at issue here is first-degree falsifying of the business records of NYU. That crime is committed when a person "commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof" (Penal Law § 175.10). According to the People, defendant sought to falsify NYU business records by manufacturing a subtle admission of plagiarism purportedly from Schiffman, with the intent that NYU would open an investigation of Schiffman. Although defendant sent damning emails in Schiffman's name to NYU addresses, that does not constitute the creation or falsification of an NYU business record that is "kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity" and the People have not pointed to any proof that defendant falsified any such records (Penal Law § 175.00 [2]). Because there is insufficient evidence to support this conviction, it must be vacated.

Accordingly, the order of the Appellate Division should be modified by vacating the convictions for counts 2, 3, 5, 23, 29, 40, 42, 44, 48, and 51, dismissing those counts of the indictment, and remitting to Supreme Court for resentencing, and, as so modified, affirmed.

Chief Judge LIPPMAN (concurring in part and dissenting in part). It would be difficult to find the conduct by defendant detailed in the majority opinion admirable. But our very different task is to decide whether that conduct was properly treated as criminal. While I see no constitutional impediment to prosecuting conduct similar to defendant's targeting Professor Schiffman as second degree identity theft—which requires for its proof evidence of intent to cause highly specific injury of a nonreputational sort—the particular counts of identity theft with which defendant was charged in the indictment's top two counts were not sufficiently proved.

Turning to the remaining welter of convictions—all for misdemeanors—I agree with the majority that defendant's convictions for aggravated harassment must be vacated and the corresponding counts of the indictment dismissed, since the statute

under which those convictions were obtained, Penal Law § 240.30 (1) (a), is unconstitutionally overbroad. I also agree that there was a failure of proof as to whether defendant's use of NYU computers was unauthorized within the meaning of Penal Law § 156.05. I, however, part company with the majority as to its dismissal of only some of the indictment's criminal impersonation counts and its determination to leave defendant's third-degree forgery convictions undisturbed.

In dismissing some, but not all, of the second-degree criminal impersonation (Penal Law § 190.25) counts, the majority expresses the view that, in addition to addressing impersonation intended to cause economic injury or to interfere with government operations—the objectives traditionally understood to inform the misdemeanor—the crime may also be premised on an intent to cause reputational injury. The statute, the majority holds, should be read to protect reputation when more than a prank is involved, since many people value reputation more than money, and since, as Iago in a moment of famous irony remarks to Othello, "he that filches from me my good name Robs me of that which not enriches him And makes me poor indeed." There is, of course, nothing in the language of the statute to prevent its use in the manner proposed by the majority—but that is the problem. The statute, as written, allows a criminal conviction for impersonation provided only that it is meant to be harmful or beneficial in any way. It is hard to imagine any pseudonymous communication that could not be prosecuted under this statute. And, in an age in which pseudonymous communication has become ubiquitous, particularly on the Internet, this statute, literally understood, criminalizes a vast amount of speech that the First Amendment protects.

The problem of the statute's substantial overbreadth is not obviated by the Court's pronouncement that the enactment should not be understood to criminalize conduct not intended to cause "real harm." Apart from the fact that the distinction the majority has drawn does not render the statute benign, since many things said using an assumed identity are constitutionally protected from civil or criminal sanction, even though they are more than pranks and are intended to cause real harm or to obtain real benefit,* this prosecution's use of the statute was not limited in the way the Court now says it should have been.

---

* It is difficult to imagine, for example, that an ill-intended, pseudonymously uttered comment about Iago or his modern equivalent would be actionable civilly, much less criminally.

Although defendant, after the denial of his motion to dismiss on the ground, among others, of statutory overbreadth, sought to have the jury charged so as to limit the statute's reach, the trial court's charge did not do that and there is no basis now to suppose that the convictions at issue were rendered in observance of the distinction this Court has retrospectively drawn; five of the criminal impersonation convictions concededly were not, and it is entirely speculative that the remaining nine were.

The problem with the criminal impersonation convictions is not that they were insufficiently supported. The evidence as to each of the counts was more than adequate to prove the offense as defined in the statute and as charged. The reason that the convictions must be vacated and the corresponding counts dismissed is rather that the statute under which they were obtained is unconstitutionally broad, and substantially so.

The use of the third-degree forgery statute (Penal Law § 170.05) to the same end as the criminal impersonation statute is, I believe, similarly objectionable. Treating pseudonymous emails as forgeries when they are made with some intent to "injure" in some undefined way is no different than penalizing impersonation in Internet communication for the same amorphous purpose. Both treatments give prosecutors power they should not have to determine what speech should and should not be penalized.

If defendant has caused reputational injury, that is redressable, if at all, as a civil tort, not as a crime. Criminal libel has long since been abandoned (*see Garrison v Louisiana*, 379 US 64, 69 [1964]), not least of all because of its tendency in practice to penalize and chill speech that the constitution protects (*see Ashton v Kentucky*, 384 US 195, 200-201 [1966]), and it has been decades since New York's criminal libel statute was repealed. The use of the criminal impersonation and forgery statutes now approved amounts to an atavism at odds with the First Amendment and the free and uninhibited exchange of ideas it is meant to foster.

I would dismiss the indictment in its entirety.

Judges GRAFFEO, READ, SMITH, PIGOTT and RIVERA concur with Judge ABDUS-SALAAM; Chief Judge LIPPMAN dissents in part in an opinion.

Order modified by vacating the conviction on counts 2, 3, 5, 23, 29, 40, 42, 44, 48 and 51 of the indictment, dismissing those

counts of the indictment, and remitting the case to Supreme Court, New York County, for resentencing and, as so modified, affirmed.