People v Roberts (2018 NY Slip Op 03172)

People v Roberts

2018 NY Slip Op 03172 [31 NY3d 406]

May 3, 2018

Rivera, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 22, 2018

[*1]

The People of the State of New York, Appellant,
v
Kerri Roberts, Respondent.
The People of the State of New York, Respondent, 
 v Terrie J. Rush, Appellant.

Argued March 22, 2018; decided May 3, 2018

People v Roberts, 138 AD3d 461, reversed.
People v Rush, 148 AD3d 1601, affirmed.

{**31 NY3d at 411} OPINION OF THE COURT

Rivera, J.

The common issue presented in these appeals is whether the People may establish that a defendant "assumes the identity of another," within the meaning of New York's identity theft statute, by proof that the defendant used another's personal identifying information, such as that person's name, bank account, or credit card number. Defendants Kerri Roberts and Terrie J. Rush argue that the use of personal identifying information does not automatically establish that a defendant assumes another's identity, and thus the People bear the burden of establishing independently both a defendant's use of protected information and assumptive conduct. The Appellate Division departments have split on the proper interpretation of the disputed statutory text. The First Department adopted the construction advanced here by defendants, leading to its conclusion that Roberts' conviction of identity theft was unsupported by sufficient evidence. By contrast, the Fourth Department concluded that the statute applies when a defendant, like Rush, uses the personal identifying information of another, upholding Rush's conviction. We [*2]now reject defendants' decontextualized interpretation of the statutory language and conclude that the law defines the use of personal identifying information of another as one of the express means by which a defendant assumes that person's identity.
There is also no merit to defendant Rush's additional interpretative claim that even if she assumed another person's identity, she did not "thereby" commit the requisite underlying felony of criminal possession of a forged instrument. Defendant ignores that her deposit of a forged check is sufficient to establish the charged felony. Defendant Rush's alternative claim that the trial court erroneously denied her CPL 330.30 motion to set aside the verdict based on a courtroom closure is partially unpreserved and otherwise without merit, as no constitutionally proscribed closure is apparent on the record below.{**31 NY3d at 412}
I.
People v Kerri Roberts
Defendant Roberts entered a sporting goods store in New York City and attempted to purchase over $1,000 worth of merchandise with an American Express credit card imprinted with the name "Craig E. Jonathan." Along with the card, Roberts presented the cashier with a New Jersey driver's license with a name matching the credit card, but featuring Roberts' actual photograph. When the store's machine was unable to read the credit card, Roberts insisted that the cashier enter the card number manually, even after the manager told Roberts he knew the card was fraudulent and that he would call the police if Roberts did not leave. Roberts persisted but never succeeded in purchasing the goods.
After Robert's arrest just outside the store, the police searched his wallet and found a New York State identification card bearing his photograph and the name Kerri Roberts. The wallet also contained a piece of paper, which listed an account number, an expiration date, a three-digit security code which appeared to be the card verification value number commonly printed on the back of credit cards, the names of four different types of credit cards with an "X" printed next to "American Express," and a reference to a customer name and a billing address near Buffalo. Further investigation revealed that the credit card account number on the card Roberts presented at the store was issued to a person living near Buffalo, yet that person had not given Roberts or anyone else permission to use her card, nor did the person know anyone named Craig E. Jonathan.
Roberts admitted to the police that he paid someone earlier that day for the "fake" credit card and New Jersey identification. Roberts concedes that this New Jersey Craig E. Jonathan was a fabricated identity of a fictitious person. Indeed, the New Jersey Motor Vehicle Commission confirmed it had never issued a driver's license to a "Craig E. Jonathan" and there was no one with that name in the state's records.
At Roberts' trial on one count of identity theft in the second degree (Penal Law § 190.79) and two counts of criminal possession of a forged instrument in the second degree (Penal Law § 170.25), Roberts moved to dismiss the identity theft count, arguing that he was pretending to be Craig E. Jonathan and{**31 NY3d at 413} not the actual credit card account holder. The court denied the motion and the jury convicted defendant as charged.
The Appellate Division, First Department, modified to the extent of vacating the identity theft conviction and dismissing that count of the indictment, but otherwise affirmed (People v Roberts, 138 AD3d 461 [1st Dept 2016]). As relevant to this appeal, the Court relied on its prior ruling in People v Barden (117 AD3d 216, 225 [1st Dept 2014], revd on other grounds 27 NY3d 550 [2016]), in which it held that evidence of the mere use of personal identifying information is insufficient to establish the crime of identity theft, and that, to prove its case, the People must establish that a defendant "both used the victim's personal identifying information and assumed the victim's identity" (Roberts, 138 AD3d at 462). The Court concluded the proof in the instant case established that defendant used the personal identifying information of the victim but not that he assumed her identity because, instead, "he assumed the identity of a fictitious person" (id.).
A Judge of this Court granted the People leave to appeal (28 NY3d 1075 [2016]), and denied defendant leave to appeal from the same Appellate Division order (28 NY3d 1075 [2016]).
People v Terri J. Rush
Defendant Rush was convicted for her part in a criminal scheme in which she deposited stolen and forged checks in a bank account opened under the name of an innocent third party, from which the funds were later withdrawn. As established at Rush's trial, an accomplice set up a bank account in the name of an area resident, without that resident's knowledge or permission. Around the same time, a local business discovered that several [*3]company checks had been stolen and that three had been made payable to the victim and deposited. The company notified the police, who eventually discovered that over the course of three days, Rush had deposited the stolen checks into the account opened in the victim's name and made ATM withdrawals totaling over $1,000 at different bank branches. The victim's signature was forged on the back of each check, and the deposit slips listed his name and the number of the unauthorized bank account. The bank's senior fraud investigator testified that customers did not have to show identification to make deposits, although identification was required for bank-employee-assisted withdrawals and check cashing.{**31 NY3d at 414}
During a colloquy with the judge on the first scheduled day of Rush's trial, defense counsel informed the court that the father of Rush's children was in the courtroom and counsel requested that he be present throughout the trial, including during jury selection. The judge replied, "Well, initially he can't be in here because we are lining up jurors against that wall." Then, in response to the judge's inquiry, the deputy confirmed there were not enough seats for all the prospective jurors and that the room was near capacity. The judge added,
"[u]ntil we've seated these people he cannot come in here and the reason is I don't want him mingling with the other jurors because the only place for him would be up against the wall with the other jurors who will be standing until we have seated twenty-one. He can come in as soon as that has taken place."
The judge explained that recently there had been a situation in which jurors were able to hear comments about the case from people in the courtroom. Defense counsel continued to object and suggested as an alternative that the trial be moved to a larger courtroom. The judge countered that the family member would not miss any questioning, "[j]ust twenty-one people marching in the box is all he can't observe because there is just no room." The court agreed to have the individual notified as soon as he could reenter.
Prospective jurors were brought into the courtroom, and before seating them the judge gave a brief overview of the case and had them sworn in. The names of 21 jurors were called and then seated in the jury box. It is undisputed that the family member was absent from the courtroom during this time.
At the close of the People's case, Rush moved for a trial order of dismissal, which the court denied. The jury thereafter convicted Rush of one count each of identity theft in the first degree (Penal Law § 190.80 [3]) and criminal possession of a forged instrument in the second degree (Penal Law § 170.25) for one of the three check deposits charged in the indictment. The jury acquitted Rush of the forged instrument counts for the other two deposits and the court dismissed the two corresponding identity theft counts.
Defense counsel subsequently moved to set aside the verdict pursuant to CPL 330.30 (1), arguing that the courtroom was improperly closed during jury selection. At the motion hearing,{**31 NY3d at 415} the courtroom deputy testified that right after the jurors were seated in the box, and before questioning of the jurors began, she had gone out to the hallway to locate the individual identified by defense counsel but could not find him anywhere in the lobby area of the building. When the deputy informed defense counsel at the first break during the jury questioning that she could not find Rush's family member, counsel replied, "okay." Counsel did not suggest the deputy continue to look and did not raise any objection to the court until after the verdict. The deputy further testified that she saw the man in the courtroom the next day.
The Appellate Division, Fourth Department, unanimously affirmed the judgment of conviction (People v Rush, 148 AD3d 1601 [4th Dept 2017]). The Court concluded that Rush's use of the victim's name and bank account number established that she assumed his identity within the meaning of the statute (id.). The Court held that "the phrase 'assumes the identity of another person' is [not] a discrete element that must be proved" (id. at 1602), relying on its previous decision in People v Yuson (133 AD3d 1221 [4th Dept 2015]), in which the Fourth Department expressly declined to follow the First Department's reasoning on this issue in Barden.
The Court also rejected Rush's "contention that, even assuming that she used [the victim's] personal identifying information, she did not 'thereby' commit the offense of criminal possession of a forged instrument because she possessed the check before she deposited it and the use of the identifying information did not cause her to commit the offense." Instead, the Court interpreted the term as equivalent to the phrase " '[b]y that means' or 'in that way' " (148 AD3d at 1602-1603), and concluded that the evidence was legally sufficient to establish that she assumed the victim's identity by using his personal information and thereby was guilty of criminal possession of a forged instrument when she presented the check as genuine.
Lastly, while the Fourth Department agreed with Rush that the court erred in closing the courtroom during jury selection because the trial judge was required to consider alternatives, the Court nevertheless concluded that because jury selection had not begun before the courtroom was reopened, the error was trivial and did not warrant [*4]reversal (Rush, 148 AD3d at 1604, citing Gibbons v Savage, 555 F3d 112, 121 [2d Cir 2009], cert denied 558 US 932 [2009]).{**31 NY3d at 416}
A Judge of this Court granted defendant leave to appeal (29 NY3d 1133 [2017]).
II.
New York's Identity Theft Statute
In 2002, the legislature amended the Penal Law and created the discrete crime of "Identity Theft" (Sponsor's Mem in Support, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2093; Penal Law §§ 190.78-190.83). The legislation was intended to "aid law enforcement in combating one of the fastest growing financial crimes" (Sponsor's Mem in Support, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2094). At the time, there was a growing awareness across the country and in New York of the ease with which personal information can be obtained through the use of technology and by access to the Internet, and that confidential data was vulnerable to computer security system breaches (see Rep of NY St Senate Comm on Investigations, Taxation and Govt Operations, Identity Theft: Is Your Identity Safe? [June 2000]; S Hearing 107-900, 107 Cong, 2d Sess [Mar. 20 & July 9, 2002]). The increased unauthorized use of individuals' personal information caused significant financial harm to victims, who were often unaware that their information had been stolen until they received debt collection notices or discovered their credit ratings had been ruined (Sponsor's Mem in Support, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2094). The law was drafted to ensure maximum deterrence and the prosecution of unauthorized conduct as defined in the statute.
As provided under the new law, a person is guilty of first- and second-degree identity theft
"when [such person] knowingly and with intent to defraud assumes the identity of another person by presenting [themselves] as that other person, or by acting as that other person or by using personal identifying information of that other person, and thereby . . .
{**31 NY3d at 417}"commits or attempts to commit [a felony]" (Penal Law §§ 190.79 [3]; 190.80 [3]).[FN1] 
 The Penal Law broadly defines "personal identifying information" to include the type of data commonly used in transacting commercial matters such as a person's name; address; telephone number; Social Security number; checking, savings, debit card, or credit card account number or code; signature, or "any other name, number, code or information that may be used alone or in conjunction with other such information to assume the identity of another person" (Penal Law § 190.77 [1]).[FN2] 
[*5]Defendants' Claims Based on the Statutory Text
Defendants argue that the evidence of identity theft was legally insufficient in their respective cases because the People failed to show that by defendants' acts, they each in fact separately assumed the identity of another person within the meaning of the statute. Roberts claims he did not assume the identity of the holder of the credit card number, but rather assumed the identity of the fictitious Craig E. Jonathan, placing him outside the reach of the statute. Rush claims she did not assume the identity of the victim because no one had reason to believe she was the actual holder of the bank account, and, in{**31 NY3d at 418} any case, because the victim disavowed ownership of the account, Rush did not use his personal identifying information.
In furtherance of these arguments, defendants advocate that we construe the statutory language that a defendant "assumes the identity of another person" as a discrete element that the People must prove in addition to the requirement that defendant "us[ed] personal identifying information" of that other person. In other words, they maintain that merely showing that defendants used personal identifying information of another is insufficient as a matter of law because the People must also prove factually that this was the means by which defendants assumed the identity of a real person. Alternatively, they argue that, at a minimum, the statutory language is ambiguous and the rule of lenity requires the law be read in their favor.
"[O]ur task—as it is in every case involving statutory interpretation—is to ascertain the legislative intent and construe the pertinent statutes to effectuate that intent" (Matter of M.B., 6 NY3d 437, 447 [2006]). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (People v Golo, 26 NY3d 358, 361 [2015]). "If the words chosen have a 'definite meaning, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add or take away from that meaning' " (People v Robinson, 95 NY2d 179, 182 [2000] [brackets omitted], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). "The Legislature has instructed us that in interpreting the Penal Law, the provisions must be read 'according to the fair import of their terms to promote justice and effect the objects of the law' " (People v Hedgeman, 70 NY2d 533, 537 [1987], citing Penal Law § 5.00).
"As with other statutory provisions, those contained in the Penal Law are generally to be construed so as to give effect to their most natural and obvious meaning. This is particularly important where the definition of a crime is at issue, because courts must be scrupulous in insuring that penal responsibility is not 'extended beyond the fair scope of the statutory mandate' " (id. [citations omitted]).
Nevertheless, in construing a statute courts "should consider {**31 NY3d at 419}the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy" (McKinney's Cons Laws of NY, Book 1, Statutes § 95).
[1] To establish identity theft in the first or second degree, the People must establish as the mens rea that the defendant knowingly and actually intended to defraud by the actus reus of assuming the identity of another. The statute expressly limits the manner by which a defendant assumes the identity of another to three types of conduct: by presenting oneself as that other person, acting as that other person, or using that other person's personal identifying information.[FN3] Contrary to defendants' argument, the requirement that a defendant assumes the identity of another is not a separate element of the crime. Rather, it simply summarizes and introduces the three categories of conduct [*6]through which an identity may be assumed. In other words, the "assumes the identity of another" language is the operational text that sets forth the actus reus of identity theft, while the three types of acts listed are the legislatively-recognized methods by which a defendant satisfies that element. The statute is based on the legislative determination that each listed act is a separate method by which a defendant assumes another's identity, as made clear by the strategic placement of the word "by" to separate the three listed acts from the element which they define: a defendant assumes the identity of another person "by presenting . . . as that other person, or by acting as that other person or by using personal identifying information of that other person" (Penal Law §§ 190.79, 190.80 [emphasis added]). The statute is unambiguous as to the proper scope of the actus reus.[FN4]
Defendants argue unpersuasively that each of the three categories of acts is a possible way by which a defendant may{**31 NY3d at 420} commit identity theft, but that the People must prove beyond a reasonable doubt that, in fact, defendant also assumed another's identity by such act. In support of this interpretation of the text, defendants argue that the People's construction would render meaningless the language "assumes the identity of another person," in contravention of the rule against superfluities (see People v Giordano, 87 NY2d 441, 448 [1995]). To the contrary, the language is not without meaning because it defines the essence of identity theft as the appropriation of another's specific characteristics, and each of the three acts is simply the method by which a person's identity would be assumed.[FN5] Indeed, there is no definition for identity theft other than what is found in this offense-specific statute.
If defendant were correct, the provision would have been drafted differently and the legislature would have inserted language to show that the three methods set out in the statute are insufficient on their own to establish that a [*7]defendant assumed another's identity—such as the conjunctive "and" or some similar word or phrase. Indeed, at the time New York enacted its identity theft law, other jurisdictions had used just such language. For example, in Massachusetts, a person commits identity fraud when the person, "with intent to defraud, poses as another person without the express authorization of that person and uses such person's personal identifying information to obtain or to attempt to obtain money, credit, goods, services, anything of value" (Mass Gen Laws Ann ch 266, § 37E [b] [emphasis added]). In Wisconsin, a person commits the crime of "Unauthorized use of an individual's personal identifying information or documents" when the person
"intentionally uses, attempts to use, or possesses with intent to use any personal identifying information . . . of an individual . . . without the authorization or consent of the individual and by{**31 NY3d at 421} representing that he or she is the individual, that he or she is acting with the authorization or consent of the individual, or that the information or document belongs to him or her" (Wisc Stat Ann § 943.201 [2] [emphasis added]).
Any suggestion by defendants that this interpretation contravenes the legislative purpose because it means the statutes encompass commonplace, innocent behavior or the authorized use of identifying data is unsupported by the text, which includes a mens rea requirement that cabins the statute's reach and protects against prosecutorial abuse. In addition to the necessary mens rea, each of the identity theft statutes also requires that the defendant attempts or achieves a criminal end or purpose (Penal Law §§ 190.78, 190.79, 190.80). Thus, while the act of using another's credit card falls squarely within the identity theft statutes, that act, if carried out, for example, by the guardian of an incapacitated person to fill the person's prescription or to purchase the person's meals would not constitute the crime of identity theft. Nor would the use of a person's credit card number, address or name to purchase an item online if done with that person's authorization. These are simply not the types of acts the legislature sought to punish and discourage, and they do not involve a victim whose financial security is imperiled by the use of private information.[FN6]
[2] {**31 NY3d at 422}Although Roberts asserts that the evidence is insufficient to find him guilty because he presented himself as "Craig E. Jonathan," not as the actual named holder of the credit card, he ignores the fact that Jonathan is a fictitious character and thus, for purposes of the statute, defendant could not have assumed Jonathan's identity. This is evident from the very concept of identity theft, which criminalizes the theft of another person's identity, rather than the creation of a fictitious identity. The statutory history amply demonstrates the legislature was concerned with "criminals steal[ing] the identity of law-abiding citizens" (Identity Theft: Is Your Identity Safe? at 1), and that the law was intended to protect New Yorkers "from the fraudulent use of their personal information and identity" (2002 Legis Update from NY St Assembly Consumer Affairs and Protection Comm [Dec. 2002]).[FN7] Roberts, of course, used the credit card number of a real person and thus his conduct falls within the statute. That he attempted to assume the victim's identity by using her credit card number rather than her name does not affect our analysis, because regardless of the name used, the number is personal identifying information as defined by the Penal Law, and its unauthorized use subjects a defendant to prosecution for identity theft.
[3] Similarly, albeit for a slightly different reason, the fact that defendant Rush did not present identification to persuade the bank that she was, in fact, the named account holder is irrelevant, since it is the mere act of using the personal identifying information of another—here the name and account number of the victim—that establishes the actus reus element of identity assumption. Nor does the fact that someone other than the victim opened the account affect our analysis. The identity theft statute covers a defendant's use of all types of personal identifying information defined in the Penal Law so long as the defendant intends by such use to defraud. Rush's{**31 NY3d at 423} argument that, because the victim was not actually the holder of the account, Rush did not use his personal identifying information, is illogical, as it would absolve a criminal actor of punishment every time a victim disavows the conduct which underlies the crime itself. Indeed, the only way victims may seek to avoid liability for the costs of goods and services procured by identity theft is to renounce the fraudulent use of their identity. Moreover, the type of fraudulent scheme in which Rush participated—the unauthorized and surreptitious use of the victim's name to open a bank account—is a prime example of the type of conduct the legislature sought to punish, precisely because the use of this personal identifying information in furtherance of a financial crime may result in destroying the victim's credit, subjecting that person to a criminal investigation, and far worse, making the person a suspect in the other crimes committed, as occurred here.
Our interpretation of the law is supported by the legislative history and the broader legislative scheme to address the theft and use of personal identifying information. A State Senate Committee Report drafted before the legislation was enacted noted that identity theft occurs "when criminals steal the identity of law-abiding citizens by gaining access to their personal information such as name, address, Social Security Number, credit card numbers, bank account numbers, or date of birth to apply for credit or to obtain goods, services, or money" (Identity Theft: Is Your Identity Safe? at 1). The Budget Report on Bills noted that in the statute, identity theft "is defined as the assumption of another person's identity to obtain goods, services, or credit, or to commit another crime" (Bill Jacket, L 2002, ch 619 at 4). The Chair of the State Assembly Consumer Affairs and Protection Committee noted [*8]that following the passage of the law "New Yorkers will now be protected from the fraudulent use of their personal information and identity" (2002 Legis Update). The only provision criminalizing use of personal information is the identity theft statutes, further supporting the conclusion that the legislature intended that the use itself constitutes the assumption of another's identity (compare Penal Law §§ 190.78-190.80, with Penal Law §§ 190.81-190.83).
Contrary to the dissent's argument, nor does the rule of lenity benefit defendants (dissenting op at 
436). "If two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the{**31 NY3d at 424} rule of lenity" (People v Golb, 23 NY3d 455, 468 [2014] [brackets omitted]). "The mere possibility of articulating a narrower construction, however, does not by itself make the rule of lenity applicable" (Smith v United States, 508 US 223, 239 [1993]).
Here, because the alternative construction proposed by defendants is not plausible given the clarity of the statute, the overall legislative scheme, and the supporting legislative history, the rule of lenity is inapplicable. Moreover, defendant Rush's contention that ambiguity is inherent in the statutory language as shown by the split of opinion between the two Appellate Division departments has been rejected by this Court and if adopted would lead to the absurd result that in every case where judges disagree as to the proper construction of a statute the text would be treated as ambiguous (see Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978] [a department split on interpretation of insurance policy does not make it ambiguous]; see also United States v Rentz, 777 F3d 1105, 1114 [10th Cir 2015] [existence of different views about how to best interpret statute does not alone prove law ambiguous]).
[4] Defendant Rush's alternative grounds for reversal of her identity theft conviction are without merit. She claims that the statute requires that the felony must be subsequent to and enabled by the assumption of the identity, and relies on dictionary definitions to argue that the word "thereby" should be read as "by that means" or "by means of that act." We agree that this established dictionary meaning is the proper definition of "thereby" as used in the statute (see People v Andujar, 30 NY3d 160, 163 [2017] [dictionary definitions useful in interpreting statutory language]). As such, the assumption of another's identity is the means by which a defendant commits the felony and is not a temporal precondition of the crime.
Where Rush's analysis falters is in her application of this intended meaning of the word "thereby" to support her conclusion that the People failed to establish the necessary causal link between her actions and the crime. According to Rush, she completed the underlying felony of second-degree criminal possession of a forged instrument once she possessed the checks, well before she assumed the victim's identity when depositing them. Defendant ignores that under our law a person is guilty of criminal possession of a forged instrument in the second degree when the person "utters or possesses" the check ("utters" meaning to put into circulation) (Penal Law § 170.25). Since defendant deposited the check, and in so doing placed it{**31 NY3d at 425} into circulation, she uttered the check by means of assuming the victim's identity, as reflected in the jury instruction.[FN8] [*9]
III.
Defendant Rush's Claim of an Alleged Courtroom Closure
[5] Rush's remaining claim that the courtroom was closed during jury voir dire, in violation of her Sixth Amendment right to a public trial, is without merit and partially unpreserved. A defendant's constitutional right to a public trial "has long been regarded as a fundamental privilege of the defendant in a criminal prosecution" (People v Martin, 16 NY3d 607, 611 [2011] [internal quotation marks omitted]). The Court has explained that "[a] violation of the right to an open trial is not subject to harmless error analysis and 'a per se rule of reversal irrespective of prejudice is the only realistic means to implement this important constitutional guarantee' " (id. at 613, citing People v Jones, 47 NY2d 409, 417 [1979]). This right applies broadly and encompasses public access to the jury voir dire (id.; see also People v Alvarez, 20 NY3d 75, 80 [2012]; Presley v Georgia, 558 US 209, 212 [2010]). Indeed, "[t]he ability of the public to observe questioning of [jurors] is important, both so that the judge, the lawyers and the prospective jurors will be conscious that they are observed, and so that the public can evaluate the fairness of the jury selection process" (Martin, 16 NY3d at 613). Nevertheless, there are important caveats and exceptions to this constitutional right. Notably, trial courts{**31 NY3d at 426} have limited discretion to close the courtroom to the public under unusual circumstances (id. at 611). For example, a judge may close the courtroom when open-court testimony by an undercover officer might jeopardize the officer's safety (People v Jones, 96 NY2d 213 [2001]; see also People v Hinton, 31 NY2d 71, 74 [1972] [listing situations where excluding the public may be necessary]). Also, "preservation of public trial claims is still required [as] [b]ringing a public trial violation to a judge's attention in the first instance will ensure the timely opportunity to correct such errors" (Alvarez, 20 NY3d at 81).
Here, the judge's stated intention was to have Rush's family member step outside while the prospective jurors entered the courtroom and several were seated in the jury box, which would make room for the general public and prevent the family member's contact with prospective jurors, which could have potentially tainted the jury pool. The court acted cautiously to ensure Rush's rights were protected, and explained to counsel that the family member would merely "not be able to observe the first twenty-one jurors being put into the box, no questioning occurring." Contrary to Rush's claim, the judge did not bar the family member from returning after the prospective jurors entered and were seated, or bar him from observing voir dire (Rush, 148 AD3d at 1604). In fact, the judge made clear that once voir dire began the family member "is going to observe all that." Under these circumstances, where jury voir dire had not yet begun, the directive to step out until enough prospective jurors were seated did not implicate Rush's right to a public trial or the public ability to "evaluate the fairness of the jury selection process" (Martin, 16 NY3d at 613).[FN9]
Rush relies heavily on People v Martin, in which this Court found an infringement of defendant's constitutional rights where the trial court barred defendant's father from observing a portion of voir dire because the court needed space in the courtroom and was afraid the father might influence jurors (id.). Despite its factual similarity, Martin is distinguishable because in that case the defendant's father was excluded from the courtroom while voir dire was ongoing, including the period in which some of the prospective jurors were excused and permitted to leave.{**31 NY3d at 427}
To the extent Rush implies that the courtroom was effectively closed during the public portion of the trial because the family member was excluded during the judge's preliminary remarks, notwithstanding the judge's assurance that nothing substantive would occur until after some of the prospective jurors were seated in the jury box, [*10]that claim is unpreserved. Moreover, the record is unclear that the family member was actually excluded after the jurors entered the courtroom and once the judge addressed them. However, assuming such was the case, then it was incumbent upon defense counsel to object that voir dire had commenced and bring the matter to the judge's attention to permit the timely opportunity to correct any possible error (Alvarez, 20 NY3d at 81). Not only did counsel not object, but after being alerted to the fact that the deputy was unable to locate the family member after the jurors had entered the courtroom and were seated, Rush's attorney did not state her objection or inform the court of the family member's continued absence (cf. Alvarez, 20 NY3d at 81). Instead, Rush's attorney merely responded "okay" to the deputy, suggesting that the matter was no longer of consequence.
IV.
Accordingly, in People v Roberts, the order, insofar as appealed from, should be reversed, and the case remitted to the Appellate Division for consideration of the facts (CPL 470.25 [2] [d]; 470.40 [2] [b]) and issues raised but not determined on appeal to that Court. The Appellate Division order should be affirmed in People v Rush.

Wilson, J. (dissenting in part and concurring in part). Ms. Rush stole the identity of her victim, depositing fraudulent checks into a fraudulent bank account, created in his name by use of several items of his personal identifying information (PII), from which she then made cash withdrawals. Mr. Roberts attempted to use someone else's credit card number, attached to a name of a fictional person, to buy a bunch of sneakers. The former is identity theft; the latter is not. Ms. Rush's behavior falls squarely within the language of Penal Law § 190.80; Mr. Roberts' does not. There is no reason to believe that the legislature, when enacting legislation addressed to a rampant new form of crime called "identity theft," sought to create a crime that reached the ordinary sort of larceny in which Mr. Roberts engaged. I therefore concur in the Court's affirmance of Ms. Rush's conviction, but dissent from its reversal reinstating Mr. Roberts'.{**31 NY3d at 428}
"Good name in man and woman, dear my lord,
"Is the immediate jewel of their souls:
"Who steals my purse steals trash; 'tis something, nothing;
" 'Twas mine, 'tis his, and has been slave to thousands:
"But he that filches from me my good name
"Robs me of that which not enriches him
"And makes me poor indeed." (William Shakespeare, Othello, act III, scene 3.)
 
I.
The majority's opinion violates four fundamental rules of construction, ones that we and other courts have applied countless times over centuries of jurisprudence: First, we do not read a statute (or a regulation, or a contract) so as to render words in it meaningless, unless doing so would avoid an absurd result or a conflict with some other language in the same or a related statute (or regulation, or contract). Second, we read provisions in and harmonize them with their statutory context. Third, we do not interpret statutes in a way that produces an absurd result, when a [*11]different construction avoids some or all of the absurdity. Fourth, when interpreting a criminal statute, we apply the "rule of lenity" if the reach of the statute is ambiguous.
A.
Turning to the first, "[w]e have recognized that meaning and effect should be given to every word of a statute and that an interpretation that renders words or clauses superfluous should be rejected" (Matter of Mestecky v City of New York, 30 NY3d 239, 243 [2017] [internal quotation marks omitted]; see McKinney's Cons Laws of NY, Book 1, Statutes § 231). Adhering to that canon of construction makes full use of "the clearest indicator of legislative intent": the statutory text (People v Golo, 26 NY3d 358, 361 [2015]). It also encourages the legislature (and all those whose words we may later need to interpret) to take care in writing exactly what they mean, instead of relegating to us a historical investigation of what they might have meant. Here, it is obvious that the majority has rendered nugatory a portion of the words chosen by the legislature:{**31 NY3d at 429}

Legislature
Majority

A person is guilty of identity theft in the [first, second or third] degree when he or she knowingly and with intent to defraud assumes the identity of another person by presenting himself or herself as that other person, or by acting as that other person or by using personal identifying information of that other person.
A person is guilty of identity theft in the [first, second or third] degree when he or she knowingly and with intent to defraud 
 assumes the identity of another person by present[s] himself or herself as [an] other person, or 
 by act[s] as that other person or by us[es] personal identifying information of that other person.

(Penal Law §§ 190.78-190.80). Where the legislature has stated a two-pronged test for identity theft—(1) assuming a person's identity by (2) either (a) presenting one's self as, (b) acting as, or (c) using the identifying information of that person—the majority concludes the two prongs should be read as mere restatements of one another. The crime here, as specified by the legislature, is the assumption of someone else's identity—identity theft. The crime is not, without more, the use of someone else's name, birth date, address, Social Security number or credit card number. Those are some of the means by which theft of identify may be accomplished, but the use of one or more of those items does not automatically amount to the assumption of someone else's identity. The majority's construction does not comport with the text of the statute, our canons for interpreting statutes, or our precedents construing similarly structured laws, and appears inconsistent with the legislative intent, as best as we can discern it.
If, as the majority concludes, "assumes the identity of another person" is synonymous with the clauses that follow it, then that phrase could, as illustrated above, be read out of the statute without effect. Although the majority attempts to rescue the words from desuetude by suggesting their inclusion "defines the essence of identity theft," no section in the Penal Law relies on that so-called definition—offered, for reasons unknown, outside the confines of the definition section—by using the phrase as a shorthand for what follows them; instead, other sections refer to "the crime of identity theft" or to the relevant sections by number (majority op at 
420 [emphasis omitted]; see e.g. Penal Law §§ 60.27 [1]; 190.85 [1]). At oral argument, the People freely admitted the interpretation adopted by the majority is one in which excising "assumes the identity of another person" "doesn't change the application of the statute." We do not construe statutes in that manner.
We have relied on the rule against surplusage to hold that an identically structured section of the Penal Law contains{**31 NY3d at 430} "two separate elements" (People v Giordano, 87 NY2d 441, 448 [1995]). Under that section, a person is guilty of promoting gambling in the first degree "when he knowingly advances or profits from unlawful gambling activity by: 1. Engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars; or 2. Receiving [money from certain parties or in certain amounts]" (Penal Law § 225.10).[FN1]

Notwithstanding the use of the word "by," we concluded that legislature intended the clauses on [*12]either side of the preposition to "describe different conduct" (Giordano, 87 NY2d at 447). To hold otherwise would have been to
"render the language in the opening paragraph surplusage . . . Accordingly, the statute would have no different meaning if the opening language were excised from it as defendants would do. Under well-established principles of interpretation, effect and meaning should be given to the entire statute and every part and word thereof. We should assume the Legislature had a purpose when it used the phrase . . . and avoid a construction which makes the words superfluous" (id. at 448 [internal quotation marks and citation omitted]).{**31 NY3d at 431}
The majority provides no explanation for why the rule of statutory construction on which the People relied in Giordano to establish that the two phrases in section 225.10 "must . . . be two elements of the crime" no longer applies in defendants' cases (id.).[FN2] 
[*13]
Nor is the gambling statute the only identically structured section of the Penal Law to contain two separate elements. As the majority itself notes, the arson statute follows the same grammatical structure (see majority op at 
420 n 5). "A person is guilty of arson in the third degree when he intentionally damages a building or motor vehicle by starting a fire or causing an explosion" (Penal Law § 150.10 [1]). Under the majority's new rules of grammar, which treat the word "by" as an equals sign, everyone who starts a fire has intentionally damaged a building or motor vehicle and thereby committed arson; only prosecutorial discretion keeps those scrambling eggs on a gas stove, lighting a cigarette, or firing a cap gun, from spending up to 15 years in prison.[FN3]{**31 NY3d at 432} [*14]B.
Turning to the second canon of construction, recognizing that the language at issue contains two separate elements harmonizes sections 190.78 through 190.80 with their immediate predecessor (see Statutes § 98). That section defines "personal identifying information" to include "any . . . name, number, code or information that may be used alone or in conjunction . . . to assume the identity of another person" (Penal Law § 190.77 [1]). Its plain meaning is that using a single piece of PII may, but need not always, suffice to assume a person's identity; there will be times when using just one piece of information—a birthday or a work address, for example—is not enough to assume an identity. Juries can distinguish between innocent and criminal uses of PII only if the People are required to establish not merely the intentional use of someone else's PII, but also that a defendant used that PII to assume her victim's identity. Instead of admitting the importance of that element, the majority reads sections 190.78 through 190.80 to embrace an equivalency that section 190.77 rejects—and that the majority itself attempts to disclaim (see majority op at 
421-422 n 6).
C.
Turning to the third, my reading of the statute faithfully "presume[s] that a reasonable result was intended by the Legislature" and rejects, as we must, a "construction which would make a statute absurd" (Statutes §§ 143, 145). I "carefully scrutinize this impact of [the majority's] approach because courts are governed by the principle that we must interpret a statute so as to avoid an unreasonable or absurd application of the law" (People v Pabon, 28 NY3d 147, 156 [2016] [internal quotation marks omitted]). The People concede that under the majority's construction of the statute, people who deposit checks made out to their spouses into their joint bank account, even at their spouses' request and while disclosing their own identity to the teller, have assumed the identity of their spouse—and, simultaneously, that of whomever wrote the check as well. They also admit that every actor who plays a character based on a real person has assumed that person's{**31 NY3d at 433} identity, notwithstanding their audiences being in on the act. Although the mens rea element saves the actor and the spouse from conviction, the majority's insistence that something millions of New Yorkers do each year, or that television and theatrical actors do each week, completes the actus reus of a felony or is what the legislature meant by "assumes the identity," beggars belief.[FN4] Unless "assumes the identity of another" is a separate element of the statute, the legislature's expansive definition of PII to include items shared by many people, such as birth dates, names and addresses, produces absurd results that we are bound to reject.
Several examples illustrate why the interpretation the majority adopts is untenable. Suppose my youngest daughter, passing an ice cream parlor that advertises a "free cone on your birthday," walks in and announces today is her birthday—even though it's not. She has an intent to defraud. She has used someone else's PII and thereby obtained a good. Has she stolen the identity of everyone born on today's date?[FN5]
My middle daughter passes the same ice cream parlor. The manager, now wise to birthday fraud, switches promotions: "Free cone when you sign up to receive our monthly email." She lists her younger sister's email address. Identity theft?[FN6]
{**31 NY3d at 434}My eldest happens along. She loves ice cream and practical jokes. The new promotion is: "Free cone when you register your phone number for promotional calls." She lists her lactose-intolerant uncle's landline, the telephone number associated with a four-person family. Four counts?
Sated, all three daughters want to watch a movie. They bypass a block I've installed on our Internet connection by using my Court of Appeals VPN to assume a new IP address. Identity theft? When I bog down that VPN to draft this dissent from home, they switch to Tor. A count for every person's IP address that they happen to bounce off of?
Or suppose one of my brilliant and indefatigable future law clerks lists her uncle's address in Buffalo so she may avoid taking the bar exam in New York City. She has an intent to defraud and has obtained a service. Has she stolen her uncle's identity and committed misdemeanor identity theft? That same lawyer, convicted of misdemeanor identity theft but allowed by the grace of the Fourth Department's character and fitness committee to retain her admission to the bar if she amasses additional CLE credits, submits her friend's office address on an application offering free CLE classes to every attorney in the Third Department. Has she stolen her friend's identity and earned, as a repeat offender, up to five years in prison as a class E felon?
Some of these are fun (or frightful) and fanciful examples, but many ordinary people misstate some bit of PII with the intent to deceive and thereby obtain something of value. Under the majority's interpretation, parents who [*15]enroll their children in a better public school by listing a grandparent's address instead of their own have used another's PII to their own significant benefit and are therefore guilty of first degree identity theft—a class D felony carrying a penalty of up to seven years in prison. The hundreds of thousands of underage soldiers who enlisted during World War II are not patriots but criminals. Actors and Little League players who shave their ages to secure{**31 NY3d at 435} parts or a prime spot on a team's lineup, candidates for office who lie about their legal residence to claim eligibility for office, and pickpockets who steal and use credit cards are commonplace.[FN7] Some of those behaviors are criminal, but we do not consider them identity theft because they do not involve the assumption of someone else's identity.
The statute's requirement of intent does not prevent the absurd reach of the majority's interpretation, which criminalizes a good deal of commonplace, innocent behavior. Indeed, the majority tacitly acknowledges that overbreadth by relying on prosecutorial discretion to reassure us that my daughters, my law clerk, parents using a false address or actors using a false birth date—and, in the hands of a sensible district attorney, a person finding and attempting to use someone else's lost credit card or a concert ticket bearing the owner's name—would not really be prosecuted for identity theft, though they could be under the statute.
Equally absurd, the majority's interpretation will lead juries to conflate attempted identity thefts with successful ones. Suppose the manager of the ice cream parlor knows my youngest daughter is pretending today's her birthday (because she claims the same thing each time she stops in), but still provides her—the daughter of a pretty good customer—with a free cone. Less fancifully, look to Mr. Roberts. The cashier was never fooled by the fraudulent credit card (majority op at 
412). The transaction was never completed and Mr. Roberts never took possession of the goods. The normal operation of our criminal attempt law should reduce his crime from a felony to a misdemeanor (see Penal Law § 110.05 [7]). However, because "assumes the identity" is the only language in the statute that could take account of the audience's reaction (the manager, the cashier, a credit card company, a loan officer), the majority's interpretation{**31 NY3d at 436} treats what should be reduced to attempted identity theft as a completed crime.[FN8] D.
[*16]Fourth and finally, even were the majority's broad interpretation equally well-supported, the rule of lenity would require us to endorse the narrow reading that I suggest. "[I]f two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted" (People v Andujar, 30 NY3d 160, 170 [2017], quoting People v Golb, 23 NY3d 455, 468 [2014], quoting People v Green, 68 NY2d 151, 153 [1986]). Under that "venerable rule," the "tie must go to the defendant" "not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct" (United States v Santos, 553 US 507, 514 [2008] [collecting cases]; Bell v United States, 349 US 81, 83 [1955]). Rather, the rule "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain" (Santos, 553 US at 514). "It also places the weight of inertia upon the party that can best induce [the legislature] to speak more clearly" (id.). Especially when conduct is already prescribed by other statutes, "doubt will be resolved against turning a single transaction into multiple offenses" (Bell, 349 US at 84).
II.
Recognizing "assumes the identity" as a separate element presents two further questions: what does the phrase mean, and did the People prove it beyond a reasonable doubt in these cases? The text and its legislative history establish that it was intended to reach only "one of the fastest[-]growing financial crimes" and not routine credit card theft (Sponsor's Mem, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2094). I would therefore affirm both the vacatur of Mr. Roberts' conviction and the order sustaining Ms. Rush's.{**31 NY3d at 437}
A.
Because the element is not defined in the statute, we must discern and give effect to the legislature's intent through less direct means. One avenue is dictionaries, which "serve as useful guideposts [to] . . . word[s'] ordinary and commonly understood meaning" (People v Aleynikov, 
31 NY3d 383, 387 [2018] [internal quotation marks omitted]). Here, they provide several meanings of "assume" and "identity" that are pertinent for our purposes. Black's Law Dictionary defines "identity" as "[t]he distinguishing personality or attributes of an individual" (Black's Law Dictionary [10th ed 2014], identity). Although Black's is silent as to "assume," Merriam-Webster offers "seize, usurp" and "assume control" (Merriam-Webster Online Dictionary, assume [https://www.merriam-webster.com/dictionary/assume]).
Another avenue is what the legislative history can tell us about "the mischief sought to be remedied by the new legislation" (Statutes § 95).[FN9] At oral argument, the People repeatedly emphasized that the legislature intended the identity theft statutes to address "a new type of crime": collecting substantial quantities of PII and using it to obtain loans or lines of credit. The new legislation was directed at a crime "drastically altered" by the rise of Internet technology (Is Your Identity Safe? at 4). It worked important changes to protect New Yorkers from the increasingly serious consequences of identity theft catalogued by the U.S. Congress, the Federal Trade Commission, and our own senate (id. at 3-4, 9-13). But as a closer look at the legislative history reveals, the legislature did not intend to encompass old-fashioned unauthorized credit card use within the new statute.
The legislature enacted the identity theft statutes to accomplish two purposes: to "criminalize[ ] theft of identity" and to "create[ ] a remedy for damages suffered due to identity theft and provide[ ] that a sentencing court shall consider restitution for losses incurred as the result" (Sponsor's Mem in Support, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2093). The majority's forced construction of the statutes furthers neither of those purposes.{**31 NY3d at 438}
New laws were not required to clarify that unauthorized credit card use was a serious crime. The legislature's belief that new laws were required because "the law is unclear on whether 'theft of identity' is considered a crime under current statutes" illustrates that it did not consider unauthorized credit card use to be a "theft of identity" (Sponsor's Mem, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2094). [*17]The purpose was to criminalize acquiring personal identifying information and using it to take control of a victim's identity by, e.g., opening a surreptitious account in that victim's name. That purpose did not require including old-fashioned unauthorized credit card use within the ambit of the new statute; such use was clearly illegal under existing law. The majority's assertion that the "only provision criminalizing use of personal information is the identity theft statutes" is flatly incorrect in this context: a person using a credit card to make unauthorized purchases commits larceny or theft of services (majority op at —423 
[emphasis omitted]; Penal Law §§ 155.25 et seq., 165.15 [1]). In fact, this Court first affirmed the conviction of a defendant who had used another person's credit card more than half a century ago—and did so, without controversy, under the second-degree larceny statute (People v Lorez, 21 NY2d 733, 734 [1968]).
Nor were new laws required to create a remedy for the victims of unauthorized credit use. Prior to the amendments included with the identity theft statutes, section 60.27 of the Penal Law required courts to "consider restitution or reparation to the victim" when sentencing thieves—including thieves convicted of stealing their victim's credit cards (Penal Law § 60.27 [1]; see Penal Law § 155.30 [4]).
Elevating unauthorized use of a credit card to identity theft not only fails to further the legislature's purpose, but also actively frustrates its instruction that statutes be construed to "produce equal results" rather than to "work hardship or injustice" (Statutes §§ 146, 147). A man steals my wallet, which contains $2 in cash and a credit card. He uses the latter to buy a pack of gum. Because of an earlier grand larceny conviction—perhaps stemming from the theft of my credit card information, perhaps from an entirely separate incident—he is a repeat offender guilty of a second-degree identity theft for which he could serve up to five more years in prison (Penal Law § 190.79 [4]). Had he instead purchased the pack of gum with the stolen cash, he would have been guilty of the most insignificant of petit larcenies and been exposed to no more than one additional year behind bars.{**31 NY3d at 439}
Finally, including unauthorized credit card use within the definition of "assumes the identity" is simply incommensurate with how identity theft is commonly understood. The legislative history indicates those responsible for the new law shared that understanding. They believed legislative action was required because identity theft was "a gross violation of privacy that can have disastrous consequences" (Press Release, Governor Pataki Signs Identity Theft Legislation into Law [Oct. 9, 2002]). Its victims faced the "arduous task" of "repairing their financial record, credit rating, and well-being"; "[a]ccording to one study, identity theft victims spent 330 hours in addressing the damage caused by the identity thief" (Sponsor's Mem, L 2008, ch 279 at 9, 2008 McKinney's Session Laws of NY at 1951-1952). Those descriptions are justified by an effort to criminalize true identity theft, which can devastate its victims; they would be out of proportion had the legislature understood "assumes a person's identity" to include unauthorized credit card use. Because unauthorized charges are credited to an account that victims are aware of and over which they retain control, those victims face little difficulty refusing the charges (see 12 CFR 205.6 [limiting consumer liability for unauthorized transfers]; People v Barden, 117 AD3d 216, 222-223 [2014] [describing the speedy return of Mr. Barden's victims' money], revd 27 NY3d 550 [2016]). A person who steals my credit card has filched my money, not my good name.
Rather than seriously engage with the legislative history, the majority defaults on its obligation to adopt a construction congruent to the—in this case limited—"object, spirit and purpose of the statute" (Statutes § 96). Although the legislature could have defined identity theft as broadly as the majority does today, it chose to tailor a new provision to an emerging problem while leaving old crimes to existing statutes. I have no difficulty accepting the import the legislature intended (cf. majority op at 
422 n 7). What is "unacceptable to the dissent" is the majority's theft of the legislature's identity, by striking the words "assumes the identity of" from the statute.
B.
Armed with that interpretation, I turn to the facts of these cases.
Mr. Roberts' actions—which I agree can be reduced to the act of using, or at least attempting to use, a person's credit card number (majority op at 
421)—do not rise to the level of assuming {**31 NY3d at 440}the identity of another person. Rather, his case illustrates that the majority's expansive interpretation of the statute furthers no legislative purpose. Mr. Roberts was convicted of second-degree criminal possession of a forged instrument (Penal Law § 170.25). He could also have been charged with fourth-degree criminal possession of stolen property for possessing the stolen credit card information, third-degree unlawful possession of PII for the same, fourth-degree grand larceny for stealing the credit card information, attempted grand larceny in the fourth degree for trying to steal the merchandise—or, if the card had a sufficient credit limit, with higher degrees of the criminal possession and grand larceny charges (id. §§ 165.45 [2] et seq., 190.81, 155.30 [4] et seq.). Nothing Mr. Roberts did smacks of the new type of crime inadequately addressed by preexisting provisions of the Penal Law.
[*18]
Ms. Rush, on the other hand, assumed the identity of another person. Although depositing a check made out to her victim would have been insufficient grounds for conviction, the People also established that she participated in a scheme to misappropriate that victim's address and Social Security number to use a fraudulent bank account in his name, as to which he had neither control nor knowledge. That scheme—which destroyed the victim's credit rating and subjected him to criminal investigation—"is a prime example of the type of conduct the legislature sought to punish" (majority op at 
423).
Accordingly, I dissent from the majority's decision to reinstate Mr. Roberts' conviction for second-degree identity theft and concur in its decision to affirm Ms. Rush's.
In People v Roberts: Order, insofar as appealed from, reversed, and case remitted to the Appellate Division, First Department, for consideration of the facts (CPL 470.25 [2] [d]; 470.40 [2] [b]) and issues raised but not determined on appeal to that Court.
Opinion by Judge Rivera. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Wilson dissents and votes to affirm in an opinion.
In People v Rush: Order affirmed.
Opinion by Judge Rivera. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Wilson concurs in result in an opinion.

Footnotes

Footnote 1:Second-degree identity theft requires that the person "commits or attempts to commit a felony or acts as an accessory to the commission of a felony," while first-degree identity theft applies to a defendant who "commits or attempts to commit a class D felony or higher level crime or acts as an accessory in the commission of a class D or higher level felony" (Penal Law §§ 190.79 [3]; 190.80 [3]).

Footnote 2:The full statutory text reads:
"For the purposes of sections 190.78, 190.79, 190.80 and 190.80-a and 190.85 of this article 'personal identifying information' means a person's name, address, telephone number, date of birth, driver's license number, social security number, place of employment, mother's maiden name, financial services account number or code, savings account number or code, checking account number or code, brokerage account number or code, credit card account number or code, debit card number or code, automated teller machine number or code, taxpayer identification number, computer system password, signature or copy of a signature, electronic signature, unique biometric data that is a fingerprint, voice print, retinal image or iris image of another person, telephone calling card number, mobile identification number or code, electronic serial number or personal identification number, or any other name, number, code or information that may be used alone or in conjunction with other such information to assume the identity of another person" (Penal Law § 190.77 [1]).
" '[P]ersonal identification number' means any number or code which may be used alone or in conjunction with any other information to assume the identity of another person or access financial resources or credit of another person" (Penal Law § 190.77 [2] [b]).
Footnote 3:Here we note that first- and second-degree identity theft both include attempts (Penal Law §§ 190.79 [3]; 190.80 [3]) (cf. dissenting op at 
435-436).

Footnote 4:The dissent's reliance on People v Giordano (87 NY2d 441, 448 [1995]) is inapposite (dissenting op at 
429-431). The statute at issue in that case, Penal Law § 225.10 (promoting gambling in the first degree), is an enhancement statute. As we explained, the exact language of Penal Law § 225.05, promoting gambling in the second degree, is the initial element, and section 225.10 "adds two subdivisions identifying additional elements which enhance the crime to first degree" (Giordano, 87 NY2d at 447). The identity theft statute is constructed differently, and the language "assumes the identity of another" introduces and defines the actus reus, together with the three means by which the defendant assumes the victim's identity.

Footnote 5:The dissent counters that "no section in the Penal Law relies on [this] so-called definition" (dissenting op at 
429), but this is precisely the point. Identity theft is not defined in a separate definition section because it is defined by the identity theft statute itself. For example, "arson" is not defined in the definition section for arson crimes because it is defined by the arson statute (see Penal Law §§ 150.00, 150.01). The dissent latches onto a similarity in the constructions of the arson and the identity theft statutes to suggest our construction leads to irrational results (dissenting op at 
431). It should go without saying that we are not implicitly positing a rule of construction or grammar whereby the use of the preposition "by" has the same effect in every statute or context.

Footnote 6:Many of the examples provided by the dissent collapse the statute's actus reus and mens rea, others are simply not identity theft or would be identity theft under both of our definitions of the crime, and others just fail to appreciate the statutory intent (dissenting op at 
433-434). A customer who lies to an ice cream shop employee about their birthday in order to get a free cone has not assumed the identity of another person by using that person's personal identifying information, the customer has merely lied to the employee about one piece of the customer's own personal identifying information. There is no actual person whose identity has been stolen, but an unquantifiable set of individuals who have been born on that particular date throughout human history. The dissent conflates using another person's personal identifying information with inventing false personal identifying information. "Craig E. Jonathan" here, for example, was not a stolen identity, but an invented identity. Indeed, the inclusion of information like "date of birth" and "mother's maiden name" in the definition of "personal identifying information," as "information that may be used alone or in conjunction with other such information to assume the identity of another person," is best understood as preventing a defendant from being charged separate counts for each piece of personal identifying information used when committing identity theft (see Penal Law § 190.77 [1]). A customer who, intending to defraud, provides a store employee with another's personal identifying information, knowing the employee will mistakenly believe it is the customer's personal identifying information and thereby assume the customer is that other person, commits identity theft under the dissent's definition of the crime as well as ours.

Footnote 7:Our dissenting colleague simply cannot accept the fact that the legislature has defined assumption of another's identity in a manner that is unacceptable to the dissent. We have no such difficulty, and adhere to our traditional role to interpret the statute in accordance with the express words and the legislative purpose: to criminalize using another person's personal identifying information without that person's consent or knowledge to obtain goods, services, credit, etc., or to carry out other crimes (see Sponsor's Mem in Support, 2002 McKinney's Session Laws of NY at 2093-2094).

Footnote 8:The jury charge for the count of identity theft in the first degree for which Rush was convicted stated:
"First, that on or about November 13, 2008, in the County of Monroe, at 1:26 p.m., at the Citizens Bank located at 2042 Chili Avenue, the defendant, Terrie Jean Rush, assumed the identity of [the victim] by using personal identifying information of that person. Two, that the defendant did so knowingly and with intent to defraud. And three, that the defendant thereby committed a Class D felony."
The jury charge for criminal possession of a forged instrument in the second degree stated that the jury had to find,
"[f]irst, that on or about November 13, 2008, in the County of Monroe, at 1:26 p.m., at the Citizens Bank located at 2042 Chili Avenue, the defendant, Terrie Jean Rush, uttered or possessed a forged instrument which is or purports to be, or which is calculated to become or to represent if completed a commercial instrument, that being a check. And two, that the defendant did so with knowledge that it was forged and with intent to defraud, deceive, or injure another."

Footnote 9:What occurred here is no different than if the family member had arrived while the prospective jurors were entering the courtroom and the deputy instructed him to wait until all the jurors made their way into the room. Neither situation implicates a defendant's constitutional rights or diminishes the public's access to the trial.

Footnote 1:The majority suggests "[t]he identity theft statute is constructed differently" from the gambling statute (majority op at 
419 n 4) . Another side-by-side comparison may help illustrate their parallels.

Penal Law § 225.10
Penal Law § 190.78

A person is guilty of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by: . . . [e]ngaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars; or . . . [by] [r]eceiving, in connection with a lottery or policy scheme or enterprise, (a) money or written records from a person other than a player whose chances or plays are represented by such money or records, or (b) more than five hundred dollars in any one day of money played in such scheme or enterprise.
A person is guilty of identity theft in the third degree when he or she knowingly and with intent to defraud assumes the identity of another person by presenting himself or herself as that other person, or by acting as that other person or by using personal identifying information of that other person, and thereby: . . . obtains goods, money, property or services or uses credit in the name of such other person or causes financial loss to such person or to another person or persons; or . . . commits a class A misdemeanor or higher level crime.

Footnote 2:The majority's attempt to divine the legislature's intent by observing that the language of the New York statute varies from the language used in some other jurisdictions falls flat (see majority op at 
420-421). For one thing, the legislature could rely on Giordano's holding that the language it employed did not meaningfully vary from the language in equivalent Massachusetts and Wisconsin state laws (Giordano, 87 NY2d at 447-448; see id. at 454 [Titone, J., dissenting]). For another, what survives of the legislative history evidences a desire to emulate, not exceed, the many other states that had already passed identity theft statutes (Sponsor's Mem, Bill Jacket, L 2002, ch 619, 2002 McKinney's Session Laws of NY at 2093-2094; Rep of NY St Senate Comm on Investigations, Taxation and Govt Operations, Identity Theft: Is Your Identity Safe? at 14-15 [June 2000]). Indeed, the early drafters of what became the identity theft statutes saw themselves as responding to Congress' call for nationwide, state-based protections that it lacked either the constitutional authority or the law enforcement officers to effect. That call's goal was uniformity, not an inchoate patchwork that would defeat federal efforts to statistically survey state crimes and disseminate information about state resources or invite would-be criminals to descend on the citizens of the states with the least robust protections (id.).

Footnote 3:See also Penal Law §§ 120.14 (1) (a person is guilty of second-degree menacing when "[h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm") and 120.02 (1) (a person is guilty of recklessly assaulting a child "when . . . such person recklessly causes serious physical injury to the brain of a child less than five years old by shaking the child, or by slamming or throwing the child so as to impact the child's head on a hard surface or object"). No one would contend that "displaying a deadly weapon" defines what it means to "place[ ] . . . another person in reasonable fear of . . . injury" or that a person has assaulted a child whenever he rocks a baby to sleep. If the majority is not "positing a rule of construction or grammar whereby the use of the preposition 'by' has the same effect in every statute or context," it is incumbent upon it to explain why that preposition takes on a unique meaning in these sections of the Penal Law (majority op at 
420 n 5).

Footnote 4:I have not "collapse[d] the statute's actus reus and mens rea" elements, as the majority complains (majority op at 
421 n 6). In these examples, but not others, I have openly focused on the former to underline the extent to which majority interprets "assumes the identity" in an unprecedented and unsupportable manner.

Footnote 5:The majority charges that "[m]any of the examples provided by the dissent . . . are simply not identity theft" (majority op at 
421 n 6). That is true, under both my definition and a commonplace understanding of the term, but not under the majority's definition. As its inability to pinpoint any such aberrant example suggests, every hypothetical hereinafter suggested falls—preposterous as it may sound—within the definition adopted by its opinion. The majority might as well concede, as the People did at oral argument, that the conduct described in this exact example "would have violated the identity theft statutes" as it interprets them.
Instead, it proclaims that a "customer who lies to an ice cream shop employee about their birthday in order to get a free cone has not assumed the identity of another person by using that person's personal identifying information, the customer has merely lied to the employee about one piece of the customer's own personal identifying information" (id.). I agree. So would Mr. Roberts. The majority's holding, however, leaves no doubt but that the customer could be prosecuted for third-degree identity theft.
Footnote 6:The majority asserts that a "customer who, intending to defraud, provides a store employee with another's personal identifying information, knowing the employee will mistakenly believe it is the customer's personal identifying information and thereby assume the customer is that other person, commits identity theft under the dissent's definition of the crime as well as ours" (majority op at 
421-422 n 6). Incorrect. The daughter who provides her younger sister's PII to the manager has not committed identity theft under my definition of the crime because, unlike the majority, I have not written a key phrase out of the statute. I allow jurors to recognize what the majority does not: even if that daughter has successfully misled the manager, she has not assumed her sister's identity (see part II, infra).

Footnote 7:See e.g. ABC News, Young Warriors: Veterans Lied About Their Ages, Nov. 11, 2007, http://abcnews.go.com/GMA/story?id=3850523; Nicholas Lemesh, Walt Disney: World War I Driver, Sept. 17, 2015, https://redcrosschat.org/2015/09/17/archives-walt-disney-world-war-driver; Paula Cocozza, Actors: Go Ahead, Lie About Your Age—Look How Maggie Gyllenhaal was Treated, May 21, 2015, https://www.theguardian.com/commentisfree/2015/may/21/actors-lie-age-maggie-gyllenhaal-rebel-wilson; Michael Gartland, Monserrate Slams Rival Council Candidate Over Residence Claims, Aug. 23, 2017, https://nypost.com/2017/08/23/monserrate-slams-rival-council-candidate-over-residence-claims/ (last accessed Apr. 16, 2018).

Footnote 8:The majority notes without explanation that "first- and second-degree identity theft both include attempts" (majority op at 
419 n 3). That is completely wrong. Isolated subdivisions of those sections criminalize not attempting to assume someone's identity, but successful assumptions by which a person, inter alia, attempts to commit a felony (Penal Law §§ 190.79 [3]; 190.80 [3]). The section defining third-degree identity theft does not so much as mention the word.

Footnote 9:Unfortunately, much of the bill jacket appears to have been lost (Bill Jacket, L 2002, ch 619 at 3). What remains to us is the budget report, the sponsor's memorandum collected in the session laws, snippets of Governor Pataki's press release at the bill signing, a brief committee update, and a committee report from a prior legislature session recommending a bill quite different from the one that became law.